Robert E. PINCUS, Plaintiff–Appellee,

v.

PABST BREWING COMPANY, a Delaware corporation, Defendant–Appellant.

No. 89–1673.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 26, 1989.

Decided Jan. 23, 1990.

Rehearing and Rehearing En Banc Denied Mar. 5, 1990.

George P. Kersten, argued, Bruce J. Landgraf, Kersten & McKinnon, Milwaukee, Wis., for plaintiff-appellee.

Henry A. Field, Jr., Boardman, Suhr, Curry & Field, Madison, Wis., Kevin H. Brogan, William M. Bitting, argued, Hill, Farrer & Burrill, Los Angeles, Cal., for defendant-appellant.

Before CUMMINGS, COFFEY and MANION, Circuit Judges.

CUMMINGS, Circuit Judge.

Robert E. Pincus alleges that Pabst Brewing Company ("Pabst") contracted to grant him an exclusive right of first refusal for the purchase of a wholly owned Pabst subsidiary, PMP Fermentation Products, Inc. ("PMP"), then reneged. Federal jurisdiction is based on diversity. Pincus, a chemical engineer and retired president of several Pabst subsidiaries, resides in Florida; Pabst is a Delaware corporation with its principal place of business in California. The negotiations at issue took place primarily in Milwaukee, Wisconsin, where the suit was filed on June 8, 1987.

Following a week-long jury trial, Pabst moved for a directed verdict, which was denied by the trial court. The jury returned three special verdicts, finding that Pabst had contracted to grant Pincus a valid right of first refusal, that Pabst had breached the contract, and that Pincus was entitled to $3,885,595.30 in damages flowing from the breach. On December 2, 1988, the court entered judgment in favor of Pincus and awarded damages of precisely the amount found by the jury. On March 6, 1989, by unpublished order explaining its reasoning, the trial court denied Pabst's post-trial motion for a judgment notwithstanding the verdict ("JNOV") or a new trial.

On appeal, Pabst asks this Court to enter a directed verdict or JNOV. In the alternative it requests a new trial on the issues of liability and damages. Pabst claims that it did not honor the right of first refusal because the right was never triggered, that certain evidence was erroneously admitted under Rule 803(6) of the Federal Rules of Evidence (the business records exception to the hearsay rule), and that the damages awarded were grossly excessive and not rationally related to the evidence. For the reasons that follow, the judgment of the district court is affirmed except that the damages, which were not rationally related to evidence of Pincus' expectation interest, are to be reduced to $525,000 if Pincus is willing to accept a remittitur in that amount to avoid a new trial on damages alone.

## BACKGROUND

### The Right of First Refusal

During the early 1980s, Pabst explored the sale of subsidiaries to raise cash and reorganize in the face of a series of hostile

takeover attempts. See *Kalmanovitz v. G. Heileman Brewing Co.*, 769 F.2d 152 (3d Cir.1985) (discussing fight to gain control of Pabst). Toward that end, Pabst signed a letter of intent in November 1982 to sell one of its Milwaukee-based subsidiaries, PL Biochemicals, Inc. ("PL"), to Pharmacia, Inc., a Swedish company.

At that time Pincus was president of Pabst's non-beer subsidiaries, which included both PMP and PL. Negotiations for the sale of PL were still in progress when August U. Pabst, executive vice president of operations for the brewery that bears his family name, met with Pincus regarding his future with Pabst. The two men discussed an arrangement under which Pincus would resign as president of PL, but remain president of PMP and assist Pabst in negotiating the PL sale. Pincus' salary and benefits would not change. Pincus asked Mr. Pabst if, as part of this arrangement, he could have a right of first refusal to purchase PMP, which manufactured and sold industrial fermentation products. After conferring briefly with William F. Smith, president and chief executive officer of Pabst, Mr. Pabst agreed to grant that prerogative to Pincus. Pincus' attorney drafted a concise, one-page document, which was signed by both sides within hours after the meeting. The document (hereinafter "the Pabst–Pincus agreement") stated in relevant part:

> For good and valuable consideration, [Pabst] hereby grants and gives to [Pincus] the exclusive right of first refusal to purchase the assets or stock of PMP Fermentation Products, Inc. at the price and terms of any bona fide offer made for it. This right of first refusal extends to all bona fide offers made for either the assets or stock of PMP Fermentation Products, Inc., [with an exception irrelevant to this appeal].
>
> Notice of exercise of the rights contained within this agreement shall be given by [Pincus] in writing within sixty (60) days of [Pincus'] receiving *written notice that a bona fide offer has been made and its terms and conditions.*

App. A–131 (emphasis added).

On December 17, 1982, Pabst closed the PL sale to Pharmacia. Smith acknowledged Pincus' help in closing the deal in a letter later written to Pincus. Shortly after the closing, on January 24, 1983, Pincus retired from all Pabst employment at the request of Pabst.

Immediately upon retirement, Pincus began a series of discussions with Charles Wallace, Pabst's treasurer, in an attempt to purchase PMP. Pincus submitted a proposed agreement, under which a corporation "to be formed" would contract to buy PMP and its intangible assets, such as copyrights, patents, and trademarks, for $250,000, and also to buy PMP's inventory at 90% of book value, but in no case pay more than $1.1 million for the inventory.

Pincus hoped to arrange financing to purchase PMP through Joh. A. Benckiser GmbH ("Benckiser"), a West German chemical company. On May 3, 1983, Pincus and Benckiser signed a "draft agreement," which included provisions that (1) Benckiser would lend Pincus' new corporation money for the purchase of PMP's intangible assets from Pabst and (2) Benckiser would have an option to purchase all shares of the new corporation for $300,000, following Pincus' retirement from the management of PMP.

### A Second Bidder

On June 16, 1983, a second international chemical corporation entered the picture. Armak Company, a division of a Delaware corporation with its roots in the Netherlands, proposed to purchase PMP from Pabst with an offer superior to Pincus': $500,000 for intangible assets, and cash equal to 100% of the book value of finished goods in inventory at the time of closing. Wallace informed Pincus in writing of Armak's richer proposal on June 29 and invited "an expeditious response as to whether you intend to match the Armak offer...."

Pincus' lawyer, James Urdan, complained to Wallace that this first Armak proposal was too vague for Pincus to react to it. Urdan specifically protested that the right of first refusal could not be triggered until Pincus received "the pertinent details of

the offer." Stephen C. Raymonds, then senior attorney for Pabst, responded by stating that Pabst had not then intended to trigger the 60–day right of first refusal period. Raymonds stated that Pabst was soliciting "a formal offer" from Armak, which it hoped would arrive soon. On August 11, Wallace wrote Pincus that Pabst would have Armak's draft purchase agreement around August 22 and would furnish that information to Pincus. On August 23, Wallace gave Pincus an Armak proposal labeled "draft," which described the Armak offer in some detail.

Spurred on by Armak's competing interest, Pincus and Benckiser executed a new contract on August 25, superseding their May 3rd agreement. Its notable features included a $1.5 million payment-on-demand loan from Benckiser to Pincus and an option that would allow Benckiser to acquire PMP from Pincus, Inc., the new corporation to be formed by Pincus. Benckiser would have a "call" option to acquire the stock of Pincus, Inc. for $200,000 on two days' notice; Pincus would have a "put" option to force Benckiser to acquire the stock for $200,000, also on two days' notice. It also included a confidentiality clause, prohibiting Pincus or Benckiser from discussing the new agreement with any third party. By his own estimation, Pincus would have received a total of $525,000 from Benckiser if Benckiser had exercised its option ($200,000 for sale of the stock of Pincus, Inc., $300,000 through a consulting contract over the course of six years, and $25,000 for securing a particular supply contract from Pabst). Thus under the new agreement Benckiser was entitled to buy out the new Pincus, Inc., including its PMP assets, for $525,000, instead of waiting for Pincus' retirement to trigger Benckiser's right to take over PMP.

Five days after striking this new agreement with Benckiser, Pincus submitted a fresh proposal to Pabst: $400,000 for PMP's principal patents, $100,000 for all other assets aside from inventory, and 90% of the book value of inventory. This new offer stated that Pincus would exercise his right of first refusal on behalf of a Florida corporation that he would form.

## Right of First Refusal Allegedly Triggered

In an internal memorandum dated September 6, 1983, not revealed to Pincus at the time, Pabst Treasurer Wallace informed three Pabst executives that Armak's offer was superior to Pincus' for four reasons, including the following two which suggest that Pincus was inherently disfavored despite his right of first refusal: (1) "key PMP employees" did not share Pincus' management style and (2) Armak was a large international concern with better contacts in the industry. After Pincus learned of Pabst's preference for Armak, a meeting was convened at Pabst corporate headquarters on September 21, which was attended by Pincus, his attorney Urdan, Wallace, Pabst counsel Raymonds, and John Martin, a member of the Pabst finance department. Descriptions given at trial of what was said at the meeting, going to the heart of Pincus' claims, were varied.

All agree that the focus of discussion was an "Agreement" between Pabst and Armak, which Pabst representatives handed Pincus and Urdan. Both sides also agree that Pincus and Urdan scanned the agreement in private and then said they would need more time to study it.

Pincus points to the fact that this Agreement was no longer labelled a "draft." He claims that Wallace told him that Pabst was planning to accept the Armak offer. Similarly, Pincus asserts that Pabst attorney Raymonds announced that with Pincus' receipt of the agreement, the "clock is running" on the 60–day period for Pincus' exercise of the right of first refusal. Notes of the meeting taken by Pincus' attorney Urdan quote Wallace as saying that Pabst was willing to accept the Armak offer.

Pabst emphasizes that the Armak Agreement was unsigned. Raymonds denies having made an announcement that the clock was running. Pabst not only denies that any of its executives said they planned to accept the Armak offer, but asserts further that its representatives specifically in-

formed Pincus and Urdan that Pabst President Smith and his management team had not reviewed the Armak agreement and had made no decision about its acceptability. Finally, Pabst notes that in a letter to Benckiser's attorney, dated the same day as the meeting, Pincus' attorney Urdan himself seemed uncertain whether Pincus' right of first refusal had been triggered: "I believe that this [Armak] offer is now in a form which *could* trigger the operation of the right of first refusal." App. A–594 (emphasis added).

### Right of First Refusal Allegedly Dishonored

Six days after the September 21st meeting, having received approval from Benckiser, Pincus' attorney Urdan wrote Wallace to confirm that Pincus "will meet the terms of the [Armak] offer which you have received and he wishes to proceed with the purchase." In response, eight days later, Raymonds wrote to Urdan that as a result of a fresh review of PMP and its potential contribution to Pabst's overall cash flow, Pabst had decided not to sell PMP to any party. In that letter, Raymonds also denied that Pabst had represented to Pincus that it was prepared to accept the Armak offer. "What I did say was that Pabst had received an offer from Armak which it could accept that day if it so desired," Raymonds wrote. App. A–462.

Pabst reversed field on July 27, 1984. It advised potential bidders, including Pincus, of its desire to sell PMP after all.[1] On October 16, 1984, Pabst announced its intention to sell PMP to Fujisawa Pharmaceutical Co., Ltd. ("Fujisawa"), a Japanese company, for $3.2 million plus the cost of inventory. This time there was no question about Pabst's position regarding the triggering of the right of first refusal—Pincus was given 60 days to match an offer that Pabst planned to accept.

Benckiser informed Pincus on November 27 that it did not intend to try to match the Fujisawa offer. Pincus failed to match the Fujisawa offer by December 16 and the deal was closed with Fujisawa.

### Right of First Refusal on Pincus' Right of First Refusal

After Pabst announced that PMP was no longer for sale, but before the Fujisawa deal surfaced, Pincus entered into an unusual agreement, which Judge Warren aptly described as an attempt by Pincus to salvage some value from his right of first refusal (App. A–115). Under this new arrangement, Pincus effectively gave Benckiser a right of first refusal on Pincus' right of first refusal. Benckiser had the right to match any offer to buy Pincus' right of first refusal. In exchange, Pincus received $50,000. Shortly thereafter, the chance to buy Pincus' right of first refusal was sought by yet another party, Fujisawa, which offered Pincus $100,000 for it. Benckiser exercised its right to match that offer and thus preempted it.[2] As discussed above, Benckiser later declined to exercise the right to buy PMP in the face of Fujisawa's $3.2 million offer.

### ANALYSIS

There is no dispute over diversity jurisdiction or any question that Wisconsin's substantive law applies. The forum state standard applies for reviewing the lower court's denial of the directed verdict and

---

1. In its information packet to prospective buyers, Pabst stated that PMP's pretax income was $482,000 in 1983 and was expected to jump to $896,000 in 1984. Despite this promising future, Pabst stated that it had decided to sell PMP because it "no longer fits into Pabst's long term business plan." App. A–509.

2. These elaborate arrangements serve to magnify the theoretical point made by this Court in *Frandsen v. Jensen–Sundquist Agency, Inc.,* 802 F.2d 941, 946 (7th Cir.1986), that "[t]he effect of a right of first refusal is to add a party to a transaction, for the right is triggered by an offer of sale, and the effect is therefore to inject the holder of the right into the sale transaction. Adding a party to a transaction increases the costs of transacting exponentially;...." Here the holder of the right injected still more parties into the sale transaction, creating a secondary market in the right to buy the primary product. As discussed below, however, Pabst invited this type of activity once it agreed to grant a valid right of first refusal to buy potentially valuable property.

JNOV motions. See *Rosenburg v. Lincoln Am. Life Ins. Co.*, 883 F.2d 1328, 1333 (7th Cir.1989); *Delvaux v. Ford Motor Co.*, 764 F.2d 469, 473 (7th Cir.1985). Under Wisconsin law, a directed verdict is permissible only when the evidence is " 'so clear and convincing as reasonably to permit unbiased and impartial minds to come to but one conclusion.' " *Kozlowski v. John E. Smith Sons Co.*, 87 Wis.2d 882, 275 N.W.2d 915, 918–919 (1979) (citations omitted).

A verdict should be directed against a plaintiff only where "plaintiff's evidence is insufficient to sustain a verdict after giving it the most favorable construction it will reasonably bear." *Chart v. General Motors Corp.*, 80 Wis.2d 91, 258 N.W.2d 680, 688 (1977). "Any credible evidence" is sufficient to meet this JNOV standard, particularly where the trial court has approved the verdict. *Fehring v. Republic Ins. Co.*, 118 Wis.2d 299, 347 N.W.2d 595, 598 (1984); see also Wis.Stat. § 805.14(1).

The standard for reviewing a motion for a new trial, on the other hand, is controlled by federal law. *Foster v. Continental Can Corp.*, 783 F.2d 731, 735 (7th Cir. 1986). Denial of a motion for a new trial "is not subject to review by this court except where exceptional circumstances show a clear abuse of discretion." *Spanish Action Comm. of Chicago v. City of Chicago*, 766 F.2d 315, 321 (7th Cir.1985).

## A. Right of First Refusal

 As this case demonstrates, a binding right of first refusal can be a powerful instrument. Yet a right of first refusal to buy something is more contingent than an option to buy the same thing, and is therefore less valuable. Unlike the holder of an option, the holder of a right of first refusal cannot force an unwilling owner to sell to anyone. Instead he has the right to buy, but "only if the seller decides to sell." *Edlin v. Soderstrom*, 83 Wis.2d 58, 264 N.W.2d 275, 280 (1978) (quoting Annotation, 40 A.L.R.3d 920, 924 (1971)). A right of first refusal is thus often referred to as a preemptive right; if a sale is in the offing, the holder may preempt all other potential buyers.

Pabst does not dispute that Armak's proposal was a bona fide offer. Pabst argues, however, that it did not breach a contractual obligation to Pincus for three reasons: first, because Pincus' right of first refusal was not supported by consideration; second, because Pabst did not give Pincus written notice of Pabst's intent to sell PMP, without which the right never matured; and finally because, regardless of any notice requirement, Pabst did not in fact reach an agreement to sell PMP sufficient to trigger Pincus' right of first refusal.

1. *Lack of Consideration.*—Pabst asserts that Pincus can rely only upon his 18–year history of work for Pabst subsidiaries, prior to the creation of the Pabst–Pincus agreement, to provide consideration for the right. Pabst points to Wisconsin's acknowledgment of hornbook law that past consideration alone cannot constitute consideration. *Chudnow Const. Corp. v. Commercial Discount Corp.*, 48 Wis.2d 653, 180 N.W.2d 697, 699 (1970) (dicta).

 Pincus does not rely upon past consideration. He provided sufficient evidence at trial to support the explicit recitation in the Pabst–Pincus agreement that Pabst granted him the right "for good and valuable consideration." An agreement to continue working for an employer under an altered employment arrangement is sufficient consideration to support a contract. *Prochniak v. Wisconsin Screw, Inc.*, 265 Wis. 541, 61 N.W.2d 882, 885 (1953). Moreover, an exchange of promises may constitute consideration. *Ferraro v. Koelsch*, 124 Wis.2d 154, 368 N.W.2d 666, 672 (1985).

Consideration was thus provided when Pincus stepped down as president of PL and agreed to assist with the sale of that subsidiary without any change in his rate of compensation. Put another way, the promise of a right of first refusal provided by Pabst was exchanged for the promise by Pincus to continue employment under changed circumstances. The district court found that Pabst's argument that Pincus had a pre-existing legal duty to remain at

Pabst and facilitate the PL sale was contrary to the weight of the evidence (App. A–116), a finding supported by the record. Pincus' assistance in the sale was specifically acknowledged after the fact in a letter written by Pabst's president and chief executive officer.

■ The bargain was struck swiftly and perhaps Pabst did not get the best of the deal. Nevertheless, having produced evidence of consideration, Pincus need not show that it was substantial. Inadequacy of consideration is not fatal to a contract. *St. Norbert College Foundation v. McCormick,* 81 Wis.2d 423, 260 N.W.2d 776, 780 (1978) (citing *Rust v. Fitzhugh,* 132 Wis. 549, 112 N.W. 508, 511 (1907), and *Estate of Hatten,* 233 Wis. 199, 288 N.W. 278, 286 (1940)). Thus Pabst may not argue that its full-time executives, who incidentally had access to in-house attorneys, contracted with Pincus on terms so utterly imprudent that they lacked consideration. Any dispute over the wisdom of such business judgments is left to Pabst and its stockholders.

■ 2. *Lack of Written Notice of Intent to Sell to Armak.*—By its terms, the Pabst–Pincus agreement required that Pincus receive from Pabst "written notice that a bona fide offer has been made [to Pabst] and its terms and conditions." Pabst argues that the agreement should be read to require that, before the right could ripen, Pabst had to submit to Pincus a written statement that Pabst was willing to sell to a particular third party, here Armak. The trouble is that the agreement contained no such requirement, and Wisconsin law does not support the Pabst view.

There is no clear precedent in Wisconsin law to answer the question of what acts may be sufficient to activate a right of first refusal worded the way the Pabst–Pincus agreement was worded. The facts of *Edlin v. Soderstrom,* 83 Wis.2d 58, 264 N.W.2d 275 (1978), vary from the present case in several important ways, but Justice Abrahamson's opinion provides the most recent statement of Wisconsin's scant law on the subject. A quit-claim deed for a parcel of real estate included a provision to benefit the grantors: the grantee would give the grantors "the first chance and opportunity to purchase" the parcel for the same sum paid for the deed, namely $2,275, at "any-time in the future and during the lifetime of [the grantee] that grantee desires to sell said premises." *Id.* 264 N.W.2d at 276. Sixteen years later, after both grantors had died, the grantee sold the land for $16,000 to a third party without first notifying the grantors' heirs or the personal representative of their estate. *Id.* After learning of the sale, the grantors' personal representative tendered $2,275 to the grantee and demanded enforcement of the right of first refusal in the form of specific performance at that amount. *Id.* 264 N.W.2d at 276–277.

The trial court concluded that in selling for $16,000, the grantee did not manifest a "desire to sell" according to the terms of the earlier agreement. *Edlin,* 264 N.W.2d at 280. The trial court appeared to take the position that the agreement gave the grantors only this prerogative: If and when the grantee chose to sell the same parcel *for $2,275,* then he must sell it at that price to the grantors or their heirs.

After reciting the facts of the case and defining a right of first refusal, the Wisconsin Supreme Court stated: "[The Grantors'] right to acquire the property in question is thus conditioned upon the willingness of [the grantee] to sell, and [the Grantors'] right might be enforced by specific performance *only where [the grantee's] willingness to sell has been proved."* *Edlin,* 264 N.W.2d at 280 (emphasis added). Using an abuse of discretion standard, the court then held that it was "unwilling to disturb" the determination of the trial court. *Id.* at 281. The court suggested that it was influenced by "considerations of fairness" and also expressed reluctance to grant specific performance where the intentions of the grantors and grantee were not clear from the terms of their agreement. *Id.* at 281.

*Edlin* turned on the unreasonableness of saddling a land owner who seeks to alienate his property with a "market price" then 16 years out of date, particularly where the beneficiaries of the right were deceased.

The Wisconsin Supreme Court stated it was ready to enforce a right of first refusal that was less ambiguously framed and that was not pegged to a badly dated purchase price. Thus enforcement would be available for this "first chance and opportunity to purchase" where, as here, the seller's "willingness to sell" had been proven.

Another Wisconsin case, *Rychwalski v. Milwaukee Candy Co.*, 205 Wis. 193, 236 N.W. 131 (1931), involved articles of incorporation and corporation bylaws providing that shareholders could not sell their stock without first offering it to other shareholders. The Wisconsin Supreme Court was not called upon to analyze the triggering of these stock transfer restrictions. Nevertheless, the court had occasion to describe the restrictions as permissible exceptions to "a well-established rule prohibiting restrictions upon the alienation of personal property." *Id.* 236 N.W. at 133. As the following discussion illustrates, this case is also a permissible exception that permits affirming the district court in this case. The jury was free to find that the Pabst–Pincus agreement was a valid restraint on alienation which was clearly stated and freely bargained for. This conclusion does not enlarge the terms of the agreement.

In the absence of other Wisconsin authority directly on point, it is appropriate to turn to sources upon which the Wisconsin Supreme Court might rely to resolve this very question. *Brooks v. Chicago Downs Ass'n, Inc.*, 791 F.2d 512, 514 (7th Cir. 1986). Cases collected in Corbin on Contracts suggest that the right of first refusal may be triggered by a range of events, depending on the wording of the agreement, and that there appears to be no widely accepted activating mechanism that courts read into such agreements as a matter of logic, policy, or contract law:

An actual contract of sale with a third party will doubtless always create a present right of acceptance in the holder; but a contract may provide that *less solid dealings* will create the right of acceptance as well, and most contracts do. It may be that notification of an offer by a third party to a giver of the right will create a power of acceptance in the holder of the right. Or it may be, properly interpreted, that the notification must inform the right holder that the offeree intends to accept the offer should the right of first refusal not be exercised. (Emphasis supplied and omitted.)

Corbin on Contracts, 1989 Supp., Part 1, § 261, at 379 (discussing *Washington Co. Farm Bureau Co-op. Ass'n v. B. & O.R.R. Corp.*, 31 Ohio App.2d 84, 286 N.E.2d 287 (1972)).

This argues against Pabst's contention that its reading of the contract is the reasonable interpretation. The jury was free to find that Pincus sought, and Pabst granted, a right of first refusal that could mature upon the occurrence of "less solid dealings," including manifestation that the offer was acceptable by communication of that offer.[3] None of these authorities contravenes Wisconsin's rule requiring proof of "willingness to sell," and here such willingness to sell was adequately shown as the judge and jury concluded.

Pabst's argument would be stronger if the jury had been allowed to find a breach on Pabst's part even if there were no evidence that Pabst led Pincus to believe that Pabst planned to accept the Armak offer. In fact, however, Judge Warren instructed the jurors that in order to find a breach by Pabst they had to find, by a preponderance of the evidence, proof of each of five elements, including the following: "First, that

**3.** In discussing the triggering of preemptive rights in the context of a Florida opinion, the Corbin treatise focuses on the significance of a seller's communication to the right-holder regarding the existence of a bona fide offer:

An owner of land may receive 50 offers to buy [the land] every single day, but if he does not care to sell the land, those 50 offers are not legally operative to give the holder of the right of first refusal the power to buy. The owner's

selection of a particular offer as one he might be willing to accept, and his manifestation of that willingness by communicating the particular offer to the holder of the right, is what gives the holder a present power of buying the land on the terms of that offer.

Corbin on Contracts, 1989 Supp., Part 1, § 261, at 383 (discussing dissent in *Dorson v. Bank of Palm Beach and Trust Co.*, 335 So.2d 318 (Fla. App.1976)).

Pincus received written notice from Pabst that a bona fide offer had been made by [Armak] for the assets or stock of PMP Fermentation Products, Inc.; ... Third, that Pabst Brewing Company *expressed to Pincus its intention to accept the terms of the [Armak] offer; ...*" App. A–59–60 (emphasis added).

Pabst would also present a more sympathetic case if the evidence demonstrated that it disclaimed acceptance of the Armak offer before Pincus made his bid to match that offer. But in response to Pincus' attempt to match the bid, Pabst's senior attorney wrote to Pincus that *"subsequent to receipt"* of Pincus' bid, "Pabst's upper management" had decided not to sell PMP to anyone. App. A–462 (emphasis added). As credited by the jury, the trial evidence showed that Pincus did not leap upon a stale offer and contingent acceptance. Insofar as he was concerned, the Armak offer was open and ready to be accepted by Pabst.

Pabst also fails to save its case with general principles of contract construction. " 'The language of a contract must be understood to mean what it clearly expresses.' " *Hortman v. Otis Erecting Co., Inc.*, 108 Wis.2d 456, 322 N.W.2d 482, 484 (App. 1982) (quoting *Dykstra v. Arthur G. McKee & Co.*, 92 Wis.2d 17, 284 N.W.2d 692, 702–703 (App.1979), affirmed, 100 Wis.2d 120, 301 N.W.2d 201 (1981)). The time-honored axiom applies here that if parties are allowed to convince courts to reform plainly worded contracts, "contracts would not be worth the paper on which they are written." *Upton v. Tribilcock*, 91 U.S. (1 Otto) 45, 50, 23 L.Ed. 203 (1875); accord, *Zweck v. D P Way Corp.*, 70 Wis.2d 426, 234 N.W.2d 921, 926 (1975). As terse as it was, and as unfavorable to Pabst as ensuing events proved it to be, the Pabst–Pincus agreement was not susceptible to more than one construction. See *Garriguenc v. Love*, 67 Wis.2d 130, 226 N.W.2d 414

(1975) (defining ambiguous contracts); *Zweck*, 234 N.W.2d at 926 (evidence of practical construction relevant "where contract terms may be taken in two senses"). The Pabst–Pincus agreement expressly states that when Pabst chose to provide Pincus with written notice of a bona fide offer for PMP, Pincus had 60 days within which to exercise its prerogative to match that offer.[4]

Furthermore, where a contract is ambiguous, determination of its meaning is one of fact and the Wisconsin Supreme Court "will not disturb the trial court's findings unless they are against the great weight and clear preponderance of the evidence." *Jones v. Jenkins*, 88 Wis.2d 712, 277 N.W.2d 815, 819 (1979) (citations omitted). The record in this case does not clearly demonstrate that the jury's proposed reading of the contract upheld by the trial court is contrary to the great weight of the evidence as this standard would require. The following passages, for example, from letters exchanged by Pincus' attorney Urdan and Pabst's Raymonds in July 1983 are noteworthy in light of the dispute that was to come:

> [Urdan to Wallace]
> Under the terms of the right of first refusal, Mr. Pincus has a period of 60 days to meet the terms of *any bona fide offer which you may have received for this business and the terms and conditions of which you have communicated to Mr. Pincus by written notice.*

App. A–191 (emphasis added).

> [Raymonds to Urdan]
> Chuck [Wallace] did not intend to imply that the 60 day period has been put into existence [yet] *since we do not have a valid offer from Armak or any other possible purchaser.*

*Id.* at A–195 (emphasis added).

These passages show that written notice to Pincus that Pabst was accepting an Armak

---

4. Pabst could, of course, have attempted at the time of contracting to reserve the right to trigger Pincus' power of preemption only on written notice of its intent to sell or on some other condition. See, *e.g.*, the model form in 11 Am. Jur. Legal Forms 2d (July 1989 Supp.), § 161:20.1, at 32 ("Prospective lessor agrees that before any building is leased for the purpose of

_____, that prospective lessor, or its successors or assigns, shall first notify prospective lessee, in writing, of its intention to lease such a building or portion thereof...."). This is the type of written notice requirement for which Pabst purports to have bargained. Defendant's Br. at 18.

offer would not be required to trigger the 60–day period. Raymonds did not state, "We do not have a valid offer from a purchaser that Pabst plans to accept." See also Letter of William F. Smith to Robert E. Pincus, App. A–151 (Pincus holds "a right of first refusal to any bona fide offer that we [Pabst] receive for PMP Fermentation Products from anyone else"; "before acceptance of other offers you will be given the right of first refusal").

■ 3. *Absence of Final Agreement to Sell to Armak.*—Pabst argues that it cannot be held for a breach of the contract with Pincus because Pabst did not in fact decide to sell PMP to Armak. "Whatever conversation took place on September 21, 1983," [5] Pabst could only trigger the right by making a firm decision to sell PMP, which it never did. Defendant's Br. at 23.

This contention ignores the law of agency and the clear import of the Pincus–Pabst agreement. If Pabst representatives told Pincus that Pabst was prepared to accept the Armak proposal, as the jury could credibly have found, Pabst cannot now argue that the right of first refusal was not triggered because its managers harbored secret doubts at the time. Regardless of what actions were taken or not taken by Pabst's directors, Pabst cannot now renege on representations made to Pincus by one of its attorneys and several of its highest executives. The finder of fact is to determine whether apparent agency has been established. *Iowa Nat'l Mutual Ins. Co. v. Backens,* 51 Wis.2d 26, 186 N.W.2d 196, 200 (1971). The elements of apparent agency, including reasonable reliance by Pincus, were met in this case. See *id.* 186 N.W.2d at 199–200.

B. *Attorney's Notes*

■ A district court's decision to admit or exclude evidence in a diversity case is a matter of federal law, which is reviewed under the abuse of discretion standard. *Rosenburg v. Lincoln American Life Ins. Co.,* 883 F.2d 1328, 1333 (7th Cir.1989); *Davis v. Lane,* 814 F.2d 397, 399 (7th Cir. 1987).

Stating that he was "not without some uncertainty" about the correctness of the ruling, the trial judge allowed Pincus to introduce at trial as evidence handwritten notes taken from the files of Pincus' attorney Urdan. Tr. at 311. The notes purported to record various discussions during the course of negotiations between Pincus and Pabst. Written concisely and for the most part in the past tense, the notes appear to have been created as memoranda following meetings and telephone conversations, not taken down during the meetings and conversations as verbatim quotations. See, *e.g.,* Ex. 123, App. A–587 ("Armak presented a proposal for the manufacturing arrangement. Pabst had to analyze impact of manufacturing."). Urdan testified that they were written "often simultaneously with the events or immediately after," and in any case "certainly on the same day" of each recorded event. Tr. at 313.

The sixth of the 24 enumerated exceptions to the hearsay rule within the Federal Rules of Evidence does not specifically refer to attorney's notes.[6] There appears to be no precedent directly on point.

---

5. See *supra,* p. 1547.

6. The exception states:

(6) *Records of regularly conducted activity.* A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

The notes of the advisory committee state that business records are excepted from the hearsay rule because of their "unusual reliability," which is "said variously to be supplied by systematic checking, by regularity and continuity which produce habits of precision, by actual experience of business in relying upon them, or by a duty to make an accurate record as part of a continuing job or occupation."

Pabst does not object to Pincus' having used Urdan's notes at trial to refresh Urdan's recollection for the purpose of giving testimony free of hearsay. Pabst argues, however, that the notes do not qualify as business records of "unusual reliability" entitled to be directly relied on as such by the jury. To the contrary, Pabst argues, an attorney's self-serving record of events that could be litigation-bound should be presumed unusually unreliable.

■ The contents of the notes go to the essence of the contract dispute before the jury, but the fact that they were given to the jury cannot have been sufficiently decisive to warrant a new trial. In one passage, Urdan stated: "This Armak offer is the offer Pabst is ready to accept and what they are offering under the right of first refusal." App. A–588. At another point he stated: "Wallace told Pincus that Pabst has decided to sell to Armak." *Id.* at A–590. Both of these contentions are disputed by Pabst. Use of Urdan's notes, however, was not decisive because Urdan's testimony at trial, which included cross-examination by Pabst's counsel,[7] was consistent with their contents. Even if the district court erred in allowing the notes in as evidence, they were so thoroughly cumulative of Urdan's testimony that the error was not prejudicial.

## C. *Damages*

■ Federal courts in this Circuit sitting in diversity are to apply a federal standard when determining whether a jury verdict is excessive, though our cases recognize the value of reference to state standards where precedent exists. *West v. Western Cas. and Sur. Co.*, 846 F.2d 387, 399 & n. 6 (7th Cir.1988) (gathering cases).

■ Not only does this Court have the same authority to issue a remittitur as

does the trial court, but the same standard applies in determining the amount of the remittitur. *DeRance, Inc. v. Painewebber, Inc.*, 872 F.2d 1312, 1331 (7th Cir.1989) (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure*, § 2820 at 133–134 (1973)). Because fixing a damage award is an exercise in fact-finding, only those awards that are "monstrously excessive," born of passion and prejudice, or not rationally connected to the evidence may be altered. *Matter of Innovative Const. Systems, Inc.*, 793 F.2d 875, 887–888 (7th Cir. 1986) (citations omitted). Appellate courts must of course be mindful that the district judge who approves a damages award has witnessed the "'congeries of intangibles that no stenographic transcript can convey....'" *Id.* (quoting *United States v. Bruscino*, 687 F.2d 938, 940–941 (7th Cir. 1982), certiorari denied, 459 U.S. 1211). Nonetheless, this Court has been willing to correct irrationally disproportionate awards when necessary, even damage claims more difficult to assess than those returned in this contract breach case. See, *e.g.*, *Joan W. v. City of Chicago*, 771 F.2d 1020 (7th Cir.1985).

■ This is one of the rare cases in which an appellate court can determine that the damages awarded have no rational connection to the evidence presented. The jury clearly misapprehended the expectation damages to which Pincus was entitled and ignored evidence central to the damages question. As Judge Warren correctly instructed the jury: "A party whose contract has been breached is not entitled to be placed in a better position because of breach than he would have been had the contract been performed." App. A–64; see also *Dehnart v. Waukesha*, 21 Wis.2d 583, 124 N.W.2d 664, 670 (1963). The jury left Pincus in a dramatically better position

---

**7.** Not only did Pabst counsel have the opportunity to cross-examine Urdan, they took full advantage of their right to comment on Urdan's testimony and the notes in closing argument to suggest that the notes were not trustworthy, giving the jury a chance to discount their content:

[F]or a two-hour meeting, [U]rdan [wrote on] the front and back of one sheet of paper....

I don't think there were any crossouts on it, and he wrote it because he's representing Mr. Pincus. And he said, gosh, there may be a dispute later on, and I'd better write down what I think is important, and he apparently did, and he wrote it down, I believe, [with] the best light toward his client, Mr. Pincus.

Tr. at 639.

than his rational expectation could have justified.

Pincus' expert at trial testified that the present value of Pincus' damages resulting from Pabst's refusal to sell PMP in 1983 was $4,528,723. In closing argument, Pincus' counsel requested that amount, less $150,000, or $4,378,723. Tr. at 621, 626. The jury settled on $493,128 less than that request, or $3,885,595.30 (incidentally $642,416 more than Pincus demanded in his original complaint of June 8, 1987).

The Pincus damage request was reached by first assigning a value to PMP equal to the value of the final sale of the company to Fujisawa, $3.2 million (adjusted to fit the specifics of the Armak proposal that Pincus tried to match), and adding to that amount the PMP operating profit of $896,000 for the year following Pabst's breach of the right of first refusal. Next, the $500,000 purchase price that Pincus would have had to pay to exercise the right of first refusal that was breached was subtracted, as well as the $150,000 that Benckiser paid Pincus. Pincus then enhanced this subtotal, $3,093,179, by a multiplier to account for a 10 percent growth rate for the increasingly profitable PMP. The total reached through this process was $4,528,723. App. A-585.

As a preliminary matter, the district court was correct in rejecting Pincus' strained argument that the anticipated sale of all of the stock of Pincus, Inc. by Pincus to Benckiser required by the second Pincus-Benckiser agreement cannot be equated with the sale of PMP itself. Under the Pincus-Benckiser agreement, upon sale of PMP to Pincus, Inc., Benckiser would have received the only bundle of rights that counts in this case: ownership of the assets of PMP. There was no other value inherent in Pincus, Inc. to instill the damages verdict with logic.

Turning to the remaining arguments, Pabst did not dispute that the market value of PMP would logically be pegged at what Fujisawa paid for it. Pabst argued, however, that an award based on that figure is monstrously in excess of the true benefit of the bargain. The force of this argument is obvious in light of the chain of events that was to follow logically from the sale of PMP to Pincus in September 1983, pursuant to the Pincus–Benckiser agreement of August 25, 1983: (1) the sale would have been financed by Benckiser; (2) the assets of PMP would have gone directly into the control of Pincus, Inc.; (3) Benckiser would have been free to exercise its call option to buy Pincus, Inc. on two days' notice by paying Pincus $525,000 under the arrangement discussed above. Pincus agreed in the August 25, 1983, contract not to convey the PMP assets to any party other than Benckiser, to pledge his Pincus, Inc. stock to Benckiser, and to grant a security interest in the PMP assets and inventories to Benckiser.

The district court was persuaded that conditions attached to the Benckiser–Pincus agreement were substantial enough to preclude a finding that a sale of Pincus, Inc. to Benckiser was an "absolute certainty," even with the benefit of hindsight. App. A-118. Most of the conditions appear to be boilerplate assurances, however, and Pincus has failed to point to any provisions that suggest serious sticking points. Absolute certainty is hard to achieve on any issue in any trial, particularly in the area of affixing damages. In considering the totality of the evidence, however, it is obvious that the jury perceived barriers to effectuation of the Benckiser–Pincus agreement that simply did not exist.

As Pabst points out on appeal, it is significant that this second Benckiser–Pincus contract provided absolutely no compensation for Pincus unless PMP was transferred to Benckiser under either the "put" or "call" options of the contract. This is yet more evidence that Pincus' contract with Benckiser was not contingent or inchoate— Pincus was clearly and effectively committed to following its terms if he were to exercise his right of first refusal to purchase PMP. Pincus was not obligated to finance his purchase through such an instrument, of course, but once he chose to do so he staked out the limits of the amount he could expect to earn if the deal were consummated.

From the time he first bargained for the Pabst–Pincus agreement, Pincus responded to changing circumstances with a series of enterprising agreements and negotiations. One of those, the August 25, 1983, contract with Benckiser, was developed in response to a competitive bid that Pincus could not match on his own. Pincus decided then to give up flexibility in exchange for certainty of payment. In this suit, however, Pincus may not rely upon hypotheticals that disregard the existence of that bargain.

From the start of the trial, Pincus' counsel tried to frame the loss to Pincus as the loss of ownership of PMP:

> [PMP] was the kind of business that Bob Pincus had spent his whole life, in effect, preparing for and the evidence will be that was a kind of business that was ready to roll. [Pincus] had all the pieces in place, and that's essentially the business that Pabst's breach cost Bob Pincus.

Tr. at 64.

In fact, the bargain was worth $525,000 to Pincus by the time it was breached, an amount incidentally twice what Pincus offered to pay for PMP to begin with.

It is noteworthy that this same $525,000 compensation package was resurrected after its first appearance in a different form in an October 26, 1983, agreement between Benckiser and Pincus that gave Benckiser until December 31, 1983, an opportunity to buy PMP directly and compensate Pincus with the same $525,000 package. App. A–471–472. Thus Benckiser contracted to buy Pincus' permission to waive his right of first refusal for Benckiser's benefit. That agreement went nowhere—Pabst refused to negotiate with Benckiser. But it demonstrates again the extent to which Pincus was willing to trade his right to buy for a more certain right to payment.

The jury's verdict is internally logical in the sense that it appears to be clear how it was reached. It does not, however, meet the test for rationality in light of all of the evidence presented. To ignore the import of the second Benckiser agreement is to ignore the core fact of the damages issue. This Court's decision is not a matter of differing with possible inferences made by the jury, or of rejecting creative but plausible theories advanced by counsel. It is a matter of requiring that the award bear some connection with crucial facts not in dispute.

## CONCLUSION

Judgment affirmed if Pincus is willing to accept a remittitur to $525,000. Otherwise the case is remanded for a new trial limited to damages. There will be no award of costs in this Court.