BEATRICE FROUD, Indiv. and as Special Adm'r of the Estate of James Froud, Plaintiff-Appellant, *v.* THE CELOTEX CORPORATION *et al.,* Defendants-Appellees.—RITA WILLIAMSON, Indiv. and as Adm'r of the Estate of Wyatt Williamson, Plaintiff-Appellant, *v.* THE CELOTEX CORPORATION *et al.,* Defendants-Appellees.—SHIRLEY FRIDAY, Indiv. and as Special Adm'r of the Estate of John Friday, Plaintiff-Appellant, *v.* THE CELOTEX CORPORATION *et al.,* Defendants-Appellees.

First District (5th Division)    Nos. 81-0052, 81-0053, 81-0054 cons.

Opinion filed June 25, 1982.

SULLIVAN, P. J., specially concurring.

John M. Burke, of Burke & Burke, of Chicago, for appellants.

Phelan, Pope & John, of Chicago (Peter C. John and Barbara K. Halpern, of counsel), for appellee Raybestos-Manhattan, Incorporated.

Donald J. O'Brien and Michael W. Rathsack, both of Chicago, for appellee Standard Asbestos Manufacturing and Insulating Company.

Sweeny & Riman, of Chicago (Harry G. Sachrison, of counsel), for appellee Keene Corporation, individually and as successor to Baldwin-Ehret-Hill, Incorporated.

Law Offices of John B. Grogan, of Chicago (Thomas J. Kane and John B. Grogan, of counsel), for appellee Grant Wilson, Incorporated.

French & Rogers, of Chicago (Richard G. French and Thomas F. Lucas, of counsel), for appellee Armstrong Cork Company.

Haskell & Perrin, of Chicago (Willis R. Tribler and Philip A. Jackman, of counsel), for appellee A & M Insulation Co.

Tenney & Bentley, of Chicago (Michael J. Smith and Karen S. Quandt, of counsel), for appellee AARCO Products Corporation.

Hubbard, Hubbard, O'Brien & Hall, of Chicago (Rory D. Cassidy, of counsel), for appellee Mauritzon, Incorporated.

Ross, Hardies, O'Keefe, Babcock & Parsons, of Chicago (Edward F. Ryan and Keith A. Klopfenstein, of counsel), for appellee Union Carbide Corporation.

Pretzel, Stouffer, Nolan & Rooney, of Chicago (John A. Goudge, Joseph B. Lederleitner, and Robert Marc Chemers, of counsel), for appellee Ruberoid Incorporated, a division of GAF Corporation.

Kiesler & Berman, of Chicago, for appellee Ryder Cement.

Kralovec, Marquard, Doyle & Gibbons, Chtd., of Chicago (Henry J. Marquard and Joseph J. McDonough, of counsel), for appellee Flintkote Company.

Epton, Mullin, Segal & Druth, of Chicago (Edward J. McCambridge, of counsel), for appellee H. K. Porter Company.

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Thomas J. Weithers, D. Kendall Griffith, and Frederick S. Mueller, of counsel), for appellee Owens-Corning Fibreglas Corporation.

Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee Forty-Eight Insulation.

Schiff, Hardin & Waite, of Chicago (Roger Pascal and Robert H. Riley, of counsel), for appellee Owens-Illinois, Incorporated.

Judge, Drew, Cipolla & Kurnik, of Park Ridge (James S. Stephenson, of counsel), for appellee Nicolet Industries, Incorporated, successor in interest to Keasvey-Mathison, Incorporated.

Johnson, Cusack & Bell, Ltd., of Chicago (William V. Johnson, Thomas H. Fegan, and Robert Bell, Jr., of counsel), for appellee Johns-Manville Sales Corporation, individually and as successor in interest to Johns-Manville Products Corporation.

Sloan & Connelly, of Chicago (Robert E. Davy and Mark A. Moynihan, of counsel), for appellee Celotex Corporation, individually and as successor in interest to Panacon Corporation and Philip Carey Manufacturing Company.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Harry J. O'Kane, and Daniel J. Cheely, of counsel), for appellee Pittsburgh Corning Corporation, Combustion Engineering, Incorporated, and Fibreboard Corporation.

McKenna, Storer, Rowe, White & Farrug, of Chicago (John F. White, Robert S. Soderstrom, and James P. DeNardo, of counsel), for appellee UNARCO Industries, Incorporated.

Law Offices of Thomas J. Keevers, of Chicago (Debra S. Puchowitz, of counsel), for appellee Eagle-Picher Industries, Incorporated.

JUSTICE LORENZ delivered the opinion of the court:
These three consolidated appeals present the question of whether punitive damages can be recovered under the Survival Act (Ill. Rev. Stat. 1979, ch. 110½, par. 27—6) in a common law cause of action.

James Froud and John Friday were asbestos workers who allegedly contracted peritoneal mesothelioma from prolonged exposure to asbestos products which were manufactured and sold by the defendants. Wyatt Williamson was an asbestos worker who allegedly contracted bronchogenic carcinoma from prolonged exposure to the same asbestos products. After Froud and Friday filed actions against the defendants, they died, and administrators were appointed to prosecute the actions on behalf of their estates. Williamson died before filing an action, and his administrator brought an action on behalf of his estate.

In each of these actions, count one accuses the defendants of negligence, count two is based on strict liability in tort, and count three seeks recovery of punitive damages. The defendants moved to dismiss count three of each action on the grounds that these common law actions for punitive damages abated at the death of the injured parties. These motions were granted, and the trial court found that there was no just reason for delaying appeal of its dismissal orders. (73 Ill. 2d R. 304(a).) In deference to the trial court, we note that the court stated that it is illogical and unjust to permit defendants to escape liability for punitive damages merely because they are lucky enough to injure people who die before

trial. However, the trial court reluctantly concluded that it was obligated to dismiss the actions for punitive damages.

We reverse.

The common law rule is that actions for "personal torts" abate at the death of the injured person. (Prosser, Torts sec. 126, at 898 (4th ed. 1971).) This common law rule is the source of the old adage that it was cheaper to kill people rather than to merely injure them. To counter the injustice caused by this rule, the Survival Act keeps various causes of action from abating at the death of the injured party, including "actions to recover damages for an injury to the person (except slander and libel)" (Ill. Rev. Stat. 1979, ch. 110½, par. 27—6). But, despite the fact that the statute does not distinguish between punitive and compensatory damages for injury to the person, Illinois case law has, for more than 100 years, interpreted the Act as providing that actions for punitive damages abate at the death of the injured person. (*Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 33, 330 N.E.2d 509.) Thus, as far as liability for punitive damages is concerned, it continued to be cheaper to kill people rather than to merely injure them. 61 Ill. 2d 31, 38 (Goldenhersh, J., dissenting).

Relying on *National Bank v. Norfolk & Western Ry. Co.* (1978), 73 Ill. 2d 160, 383 N.E.2d 919, the administrators in the present cases argue that the supreme court no longer construes the Survival Act as providing for the abatement of actions for punitive damages. In *National Bank*, the supreme court held that a statutory cause of action for punitive damages under section 73 of the Public Utilities Act (Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77) did not abate at the death of the injured person, even though section 73 does not contain any reference to the question of survivability.* The court explained that it reached this result because the goal of promoting public safety through the use of punitive damages would be perverted if a wrongdoer could escape liability for outrageous misconduct merely because the injured person died before trial. 73 Ill. 2d 160, 174.

As interpreted by the supreme court in *National Bank*, "[t]he Survival Act itself neither authorizes nor prohibits punitive damages." (73 Ill. 2d 160, 174.) The court further explained that "[p]unitive damages for injuries prior to death should be unaffected by the subsequent death of the injured person, for punitive recovery addresses only the nature and gravity of a defendant's wrongful and wilful act." 73 Ill. 2d 160, 174.

---

* *Section 73 provides:*

"In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, such public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was wilful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment." Ill. Rev. Stat. 1969, ch. 111 2/3, par. 77.

The precise question presented by the present appeals is whether the holding of *National Bank* is limited to statutory actions, or whether the court really meant it when it declared that "[t]he Survival Act itself neither authorizes nor prohibits punitive damages." 73 Ill. 2d 160, 174.

Justice Ryan, in dissenting from *National Bank*, pointed out that (1) there is nothing in section 73 of the Public Utilities Act which indicates that the legislature intended for this statutory cause of action for punitive damages to survive the death of the injured person; and (2) there is nothing in the Survival Act to indicate that the legislature intended to distinguish between statutory and common law punitive damages. (73 Ill. 2d 160, 178.) Moreover, awarding punitive damages in common law actions is also intended to promote public safety by punishing outrageous misconduct, and this goal would be perverted in common law cases, as well as statutory actions, if wrongdoers could escape liability whenever an injured person dies before trial. Thus, Justice Ryan concluded that "if the Survival Act is a sufficient vehicle for preserving a cause of action for statutory punitive damages, it should also be capable of preserving a cause of action for common law punitive damages. 73 Ill. 2d 160, 178.

■■■ We agree that there is no apparent basis for distinguishing between statutory provisions for punitive damages, such as section 73 of the Public Utilities Act, and actions for punitive damages based on the common law. And we are persuaded that the holding in *National Bank* is based on an interpretation of the Survival Act as a neutral vehicle which "neither authorizes nor prohibits punitive damages" (73 Ill. 2d 160, 174) in both statutory and common law actions. We therefore conclude that, under the binding precedent of *National Bank*, common law actions for punitive damages survive the death of injured persons.

■■ We note, however, that defendants' brief contains a broad-based attack on the propriety of punitive damage awards in the context of mass tort litigation, such as the large number of asbestos cases which have been filed across the nation. It is feared that, in such mass tort cases, the possibility that each plaintiff could separately recover a substantial award of punitive damages might bankrupt even the richest defendants. The defendants therefore argue that public policy should prohibit punitive damages in mass tort cases. But we do not believe that defendants should be relieved of liability for punitive damages merely because, through outrageous misconduct, they may have managed to seriously injure a large number of persons. Such a rule would encourage wrongdoers to continue their misconduct because, if they kept it up long enough to injure a large number of people, they could escape *all* liability for punitive damages.

If the defendants believe that the multitude of asbestos cases filed against them may subject them to a large number of backbreaking awards of punitive damages, they may want to consider requesting that the trial

court certify a class action of asbestos case claimants for the purpose of resolving the issue of punitive damages. See *In re Northern District of California "Dalkon Shield" I.U.D. Products Liability Litigation* (N.D. Calif. 1981), 526 F. Supp. 887 (Appeal docketed, No. _____, 9th Cir.).

In the Dalkon Shield case, the defendant faced claims of $2.3 billion in punitive damages arising out of a large number of injuries allegedly caused through the use of its product, but the defendant itself had a net worth of only $280,394,000. Recognizing the danger of punitive "overkill," the trial court granted defendant's motion to certify a class action of plaintiffs for the purpose of resolving, in a single trial, the question of punitive damages in all Dalkon Shield cases. As contemplated by the district court, the jury—if it found for the named plaintiffs on the issue of liability, and found for the class on the issue of punitive damages—would be asked to award a single sum as punitive damages on behalf of *all* potential claimants. (526 F. Supp. 887, 920.) This procedure would permit each claimant who eventually prevailed on the issue of liability to share in the award of punitive damages, and it would eliminate the likelihood that the defendant would be bankrupted by multiple awards of punitive damages.

We express no opinion on the merits of such a procedure under Illinois law, but we mention it to show that courts can protect defendants in mass tort cases from "execution" by punitive damages without granting them immunity from such damages.

For the preceding reasons, the judgment of the circuit court is reversed, and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded with directions.

MEJDA, J., concurring.

PRESIDING JUSTICE SULLIVAN, specially concurring:

In view of the reasoning in *National Bank v. Norfolk & Western Ry. Co.*, as set forth in the majority opinion, I concur in the result reached. However, that case involved an action under section 73 of the Public Utilities Act (Ill. Rev. Stat. 1977, ch. 111 2/3, par. 77), which expressly provides for punitive damages and, because it was not specifically stated in *National Bank* that common law punitive damages were recoverable under the Survival Act, there remains a question in this regard.

I am in accord also with the suggestion of the majority that in class litigation, to avoid punitive damages "overkill," Illinois could adopt the "Dalkon Shield" concept of a separate trial to award a single sum as

punitive damages for all plaintiffs present and potential, with percentage to each based upon the compensatory damages received.[1] Nevertheless, the Dalkon Shield concept would not satisfy the contention of the 22 law firms appearing for defendants that public policy should prohibit awards of punitive damages.

While I disagree with this contention, it cannot be denied that the spectre of the destruction of companies, and even individuals, as a result of punitive damage awards is a threatening, present reality. Such awards have become increasingly greater in recent years, as indicated by the recent single personal injury jury verdict in the amount of $127.8 million, of which $125 million was for punitive damages. (Richard Grimshaw v. Ford Motor Co., Superior Court, Santa Ana, Cal., February 1978.) The punitive damages in that case were reduced by the trial court to $3.5 million, but the amount of the initial award and the many others rendered in considerable amounts[2] point out the problem, as stated by Judge Friendly in *Roginsky v. Richardson-Merrell, Inc.* (2d Cir. 1967), 378 F.2d 832, 841:

> "[T]he apparent impracticability of imposing an effective ceiling on punitive awards in hundreds of suits in different courts may result in an aggregate which, when piled on large compensatory damages, could reach catastrophic amounts. * * *
>
> [A] sufficiently egregious error as to one product can end the business life of a concern that has wrought much good in the past and might otherwise have continued to do so in the future, with many innocent stockholders suffering extinction of their investments for a single management sin."

Punitive damages, sometimes referred to as exemplary damages, appears to have been first recognized in *Huckle v. Money* (1763), 2 Wils. K.B. 206, 95 Eng. Rep. 768, as a means of justifying damage awards in excess of plaintiff's tangible harm to punish defendants in instances of malice, oppression or gross fraud, *i.e.*, where the manner of performance made the conduct "outrageous." It has developed in this country to the extent that the amounts of such awards in the aggregate could not only result in the end of a business, as suggested by Judge Friendly, but also the financial destruction of an individual.

This is particularly so in Illinois, because it has been held in a recent

---

[1] It should be noted (a) that the district court decision promulgating the Dalkon Shield concept is presently on appeal in the ninth Circuit Court of Appeals and (b) that the concept could be used only if *Miner v. Gillette Co.* (1981), 87 Ill. 2d 7, 428 N.E.2d 478, which held that a class action may be maintained on behalf of nonresident plaintiffs, is not reversed by the United States Supreme Court—where a petition for *certiorari* has been granted.

[2] Such as $10,500,000 in Rosendin v. Avco-Lycoming (Santa Clara County, Cal., March 1971) and $850,000 in a MER-29 case in New York, where hundreds of similar cases were filed throughout the country.

case (*Beaver v. Country Mutual Insurance Co.* (1981), 95 Ill. App. 3d 1122, 420 N.E.2d 1058) that public policy prohibits insurance against liability for punitive damages arising out of one's own conduct.

The possible catastrophic effect of this ruling is evident when it is realized that awards of punitive damages are readily obtainable in this State. The recovery may be had where the defendant is guilty of "wilful and wanton misconduct," with the jury instructed as follows:

> "If you find that defendant was guilty of wilful and wanton conduct which proximately caused injury to the plaintiff and if you believe that justice and the public good require it, you may, in addition to any damages to which you find plaintiff entitled, award plaintiff an amount which will serve to punish the defendant and to deter others from the commission of like offenses." Illinois Pattern Jury Instructions, Civil, No. 35.01 (2d ed. 1971) (hereinafter IPI Civil).

> Willful and wanton misconduct has been defined for the jury as "a course of action which shows actual or deliberate intention to harm or which, if not intentional, shows an utter indifference to or conscious disregard for a person's own safety and the safety of others." (IPI Civil No. 14.01.)

Under these instructions, as a practical matter, awards of punitive damages may be obtained where the conduct is only slightly greater in degree than mere negligence.

It appears that four States disallow awards of punitive damages—Massachusetts, Louisiana, Nebraska and Washington—and that England, which invoked the doctrine, has done away with it except in cases (1) "of oppressive, arbitrary or unconstitutional action by the servants of the government"; (2) "in which the defendant's conduct has been calculated by him to make a profit for himself which may well exceed the compensation payable to the defendant"; and (3) "in which exemplary damages are expressly authorized by statute." *Rookes v. Barnard* (1964), AC 1129, 1220, 1223.

While it may be true, as defendants contend, that punitive damages are a windfall to plaintiffs who have already been fully compensated, it is noted that they are provided for in certain statutes and that there are extreme circumstances where such awards might serve some societal need. However, because of the problems as outlined above, particularly the possible unavailability of liability insurance, it does appear that the concept should be examined to determine, among other things, (1) whether the reason for punitive damages has ceased to exist and, if not, should they be awarded only for extremely flagrant conduct; (2) whether recovery should be allowed only by statute; (3) whether the amount recovered should bear some relation to the harm involved and the com-

pensatory damages received; (4) whether the awarding of unlimited damages as a punishment to deter like offenses is unfair compared to the fixed minimum and maximum criminal penalties which are also imposed as punishment and deterrence; (5) whether the standard of proof should be "clear and convincing" rather than preponderance; and (6) whether payment of such awards should be made other than to the already fully compensated plaintiffs, such as to a public fund.