**ROBOSERVE, INCORPORATED,**
a Delaware corporation,
**Plaintiff–Appellee,**

v.

**KATO KAGAKU COMPANY, LIMITED,**
a Japanese company, **Defendant–Appellant.**

No. 95–1371.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 7, 1995.

Decided Feb. 23, 1996.

Rehearing and Suggestion for Rehearing En Banc Denied May 6, 1996.

Eric C. Cohen, Robert B. Breisblatt, argued, A. Sidney Katz, Laurie A. Haynie, Jerold B. Schnayer, Welsh & Katz, Chicago, IL, for Plaintiff–Appellee.

Jerome H. Torshen, argued, Abigail K. Spreyer, Torshen, Spreyer & Garmisa, Chicago, IL, Michael P. Connelly, Kathleen A. Bridgman, Eugene S. Kraus, Charles P. Piacentini, Connelly & Schroeder, Chicago, IL, Nicholas J. Bua, Burke, Weaver & Prell, Chicago, IL, for Defendant–Appellant.

Before RIPPLE, MANION, and KANNE, Circuit Judges.

MANION, Circuit Judge.

On August 4, 1992, Roboserve, Inc. ("Roboserve"), sued Kato Kagaku Co., Ltd. ("Kato"), claiming breach of contract, wrongful termination, and fraud. The parties went to trial on October 18, 1993 and the jury returned a verdict in Roboserve's favor on all counts, awarding it compensatory and punitive damages totalling $9,950,000. Subsequently, Kato filed a motion for judgment as a matter of law or, in the alternative, for a new trial or a remittitur. The district court agreed with Kato on certain technical points and granted a remittitur of $127,500, but otherwise upheld the jury's verdict. On appeal Kato challenges the verdict and damages award as utterly contrary to the evidence. We affirm the jury's findings of breach of contract, wrongful termination, and fraud, but vacate the award of damages for

breach of contract and fraud (including punitive damages) and remand for a new trial on those issues unless Roboserve accepts a substantial remittitur.

## I. Background[1]

Roboserve, a Delaware corporation, leases and services hotel minibars. Kato, a Japanese company, owns the Hyatt Regency Chicago ("HRC"). The HRC is managed by Hyatt Corporation ("Hyatt"), a corporate entity separate from Kato. On June 23, 1986, Roboserve and Hyatt entered into a Concession Agreement ("Agreement") providing that Roboserve would install 1000 of its "Robobar" minibars in HRC rooms. The Agreement also required the HRC to use "reasonable endeavors" to place those guests most likely to use minibars in the Robobar rooms and to encourage them to make purchases from the minibars.[2] The system was to be installed by the end of 1986, and the Agreement was to be effective for five years, beginning with the time 25% of the Robobars were installed.

According to Roboserve, due to delays in installation, Roboserve and Hyatt negotiated an amended Agreement on October 2, 1986. The amended version altered the Agreement's duration, making it last five years from "the date when *all* the Robobar units have been commissioned," meaning installed. (Emphasis added.) Kato vigorously denies the Agreement was ever amended.

Between February and April 1987, Roboserve installed 900 of the 1000 units called for in the Agreement. Hyatt officials then decided to review the success of the Robobar program before proceeding with further installations in the HRC or other Hyatt hotels. At the time Roboserve was hoping to secure a nationwide contract with Hyatt, so it was less than insistent about enforcing its contractual right to install the remaining 100 bars.

Despite Hyatt's commitment to promote Robobars, Roboserve learned in late 1987 and early 1988 that Hyatt intended to contract with ServiSystems, a Roboserve competitor, to install in HRC's east tower a number of "ServiBars," ServiSystems' minibars. (The Robobars were to remain in the west tower.) A November 11, 1988 letter to Roboserve from Hyatt vice president David Zadikoff explained this as a test "to evaluate the two Honor Bar systems that are presently being utilized in our hotels—Robobar and ServiBar." Mr. Zadikoff assured Roboserve that Hyatt's agreement with ServiSystems was for "a one-year test period only." According to Roboserve, Hyatt representatives also indicated orally that the winner of the test would become the preferred minibar provider for Hyatt hotels and would "get the Hyatt business." By the time the November 11 letter was sent, Kato had purchased the HRC and designated Hyatt as its manager.[3]

Roboserve won the one-year test and soon thereafter began protracted negotiations with Hyatt about replacing the ServiBars in the HRC with Robobars. However, the evidence suggests (and the jury ultimately believed) that the one-year test was a pretext. Unbeknownst to Roboserve, by the time Hyatt announced the test it had already signed a contract with ServiSystems to provide ServiBars for the HRC "for a term commencing on May 15, 1988 and expiring on May 14, 1995." During the negotiations, Hyatt's official position was that Roboserve was the preferred provider of minibars, which Roboserve claims caused it to fully anticipate getting the broader Hyatt business and thus to forego any attempt to force the installation of the remaining 100 bars at the HRC.

---

**1.** We adopt the district court's rendition of the facts, the necessary parts of which are repeated here. *See Roboserve, Inc. v. Kato Kagaku Co., Ltd.,* 873 F.Supp. 1124, 1126–27 (N.D.Ill.1995).

**2.** Section 8(1)(n) of the Agreement required Hyatt to "use reasonable endeavors to procure that rooms in which RoboBar Units are operating are first let to guests who are best able to use the facilities thereby offered and in priority to

any rooms at the Location in which no such unit is operating." Section 9(3) required Hyatt to "use ... reasonable endeavors to encourage the purchase of merchandise from the RoboBar Units at the Location ..."

**3.** On August 12, 1988, Kato acquired the HRC, and on October 18, 1988, Kato assumed the prior owner's management agreement designating Hyatt as the HRC's manager.

The negotiations dragged on for about three years. Finally, on February 26, 1992, Hyatt confessed that it had "complications of another contractual arrangement" and would be unable to replace the ServiBars with Robobars. On December 14, 1992, Hyatt informed Roboserve that, as of March 1, 1993, it was terminating the Agreement.

Roboserve sued Kato alleging that Kato, through its agent Hyatt, (1) breached the Agreement by not allowing the installation of all 1000 bars and by failing to properly promote the Robobars, (2) wrongfully terminated the contract before its five-year term had begun, and (3) defrauded Roboserve of further Hyatt business. (At oral argument counsel for Roboserve stated that because Hyatt was Kato's agent, they "did not have to" sue Hyatt.) Roboserve claimed that as a result it suffered $1 million in damages from the breach of contract and another $1 million on account of the fraud (the wrongful termination count merely asked for specific performance). The prayer for relief then requested $4 million in actual and consequential damages and $2 million in punitive damages. The jury did not stop there, however. Not only did it find for Roboserve on each count, it also awarded nearly $10 million in damages: $2.1 million for the breach of contract, $850,000 for the wrongful termination (reduced by the court to $722,500), and $7 million for fraud ($1 million in compensatory and $6 million in punitive damages).

## II. Analysis

On appeal, Kato challenges both the finding of liability and the amount of the damages award for each claim. Regarding the fraud claim, Kato contends that the district court improperly permitted the jury to hear evidence suggesting that Hyatt fraudulently promised Roboserve business opportunities beyond the HRC. According to Kato, this caused the jury to believe that Kato was responsible for actions of Hyatt which were well beyond the scope of the Kato–Hyatt agency relationship. Kato challenges the award of $1 million in damages for fraud on the ground that the jury improperly based its calculations on the value of Hyatt's unfulfilled promises of business beyond the HRC, which Kato never had the means to deliver. Kato also denies the evidence suggests conduct sufficiently gross or outrageous to justify the award of any punitive damages, let alone $6 million.

As for the contract claim, Kato argues that the Agreement's "reasonable endeavors" clause was too vague to be enforceable and that the district court improperly excluded evidence that Roboserve waived its rights to install all 1000 Robobars. With respect to the $2.1 million award for contract damages, Kato contends that the jury improperly compensated Roboserve for lost profits to which it was never entitled.

Finally, Kato challenges the verdict on the wrongful termination claim by arguing that the Agreement was never amended and that, at any rate, it was never truly terminated. Kato challenges the damages award (like that for breach of contract) on the ground that it was based on calculations of lost profits to which Roboserve was never entitled.

### A. Fraud

#### 1. Scope of Kato's liability for Hyatt's acts.

Initially, we consider Kato's contention that the district court improperly allowed the jury to consider as evidence of fraud certain promises Hyatt allegedly made to Roboserve concerning business at other Hyatt hotels. Such promises, Kato argues, were well beyond the scope of the Kato–Hyatt agency relationship, which was limited to the management of the HRC.[4] As a result, the jury heard evidence that Roboserve lost a large volume of business Kato was never in a position to deliver and awarded

---

4. There seems to be no question that Kato can be held liable for Hyatt's actions taken on behalf of the HRC. It is well established under Illinois law that a principal can be held vicariously liable for the acts (including gross fraud) of its managerial agents. *Mattyasovszky v. West Towns Bus Co.*, 61 Ill.2d 31, 330 N.E.2d 509, 512 (1975).

Since Kato admits that Hyatt manages the HRC, it necessarily concedes that it is potentially liable (for compensatory and punitive damages) for Hyatt's actions in relation to the HRC. We agree with the district court's thorough analysis of the agency issue. *Roboserve, Inc.*, 873 F.Supp. at 1134–35.

damages accordingly. Roboserve counters that Kato's HRC directly benefitted from Hyatt's ability to extract concessions favorable to Kato through alluring allusions to other Hyatt business opportunities.

■ Kato is correct that it cannot be held liable for Hyatt's statements to Roboserve concerning deals at other Hyatt hotels. The scope of Hyatt's agency relationship with Kato simply did not extend beyond the management of the HRC. Moreover, as a sophisticated player in the hotel industry, Roboserve knew (or should have known) that Kato could not deliver business at hotels it did not own. The evidence indicates that Roboserve courted Hyatt not merely as Kato's agent for the HRC but as a separate corporate entity, as the gatekeeper for business at Hyatt hotels nationwide. Therefore, to the extent it was wrongfully deprived of the broader Hyatt business, Roboserve's gripe is with Hyatt, not Kato. The district court came to this conclusion in ruling on Kato's post-trial motion, holding that "Roboserve cannot place at Kato's feet liability for fraud that extended beyond its domain, certainly not the value of all leverageable business beyond its domain." *Roboserve, Inc.,* 873 F.Supp. at 1135. The court then ruled that "to the extent that the jury found Kato vicariously liable for Hyatt's fraud beyond the HRC, we grant Kato's motion for judgment as a matter of law." *Id.* However, the district court assumed that the jury had also reached the same conclusion and had "discounted the award by an appropriate amount." *Id.* at 1142. Thus, the district court permitted the jury's award to stand.

■ Kato's contention remains, then, that evidence of Hyatt's conduct for which Kato was not liable was improperly admitted at trial. This court reviews claims that evidence was improperly admitted under an abuse of discretion standard, "giving the judge great deference." *Littlefield v. McGuffey,* 954 F.2d 1337, 1342 (7th Cir.1992). The "relevant inquiry" is "whether any reasonable person could agree with the district court." *Id.*

Although the trial judge could have been more restrictive, we find no abuse of discretion in admitting evidence of those Hyatt

dealings that extended beyond the HRC. Roboserve's theory of recovery on the fraud count depended upon showing that Hyatt, acting as Kato's agent, improperly used promises of future Hyatt business, not only at the HRC but also at other hotels, to extract concessions from Roboserve that were beneficial to Kato. It would have been more difficult for the jury to get the entire picture of this complex transaction without evidence of all the negotiations and maneuverings. As we hold below, the district court's error was not in allowing the jury to hear such evidence but in failing to reduce the jury's unfounded award of damages.

*2. Liability.*

■ Kato's challenge to the jury's fraud verdict faces a formidable hurdle in the established standard of review. Under Illinois law, we may overturn the verdict only if "all of the evidence, when viewed in its aspect most favorable to [Roboserve], so overwhelmingly favors [Kato] that no contrary verdict based on that evidence could ever stand." *Commercial Credit Equipment Corp. v. Stamps,* 920 F.2d 1361, 1365 (7th Cir.1990). We cannot, as Kato seems to implore, reweigh the evidence; we cannot disturb a verdict merely because we happen to view the evidence differently than did the jury.

■ After a review of the record, we find that there is sufficient evidence for a reasonable jury to have found that Roboserve was induced by the diversionary one-year test to forego its contractual rights in the hopes of receiving additional HRC business. Because of this, and the additional reasons elaborated in the district court's opinion, we hold that Kato is not entitled to judgment as a matter of law on the question of liability for fraud. *Roboserve, Inc.,* 873 F.Supp. at 1133–34.

*3. Compensatory damages.*

■ The jury's award of $1 million in compensatory and $6 million in punitive damages is another matter. Compensatory damages for fraud are intended to compensate for "any injury which is the direct and natural consequence of [the plaintiff's] acting on

the faith of defendant's representations." *Gold v. Dubish*, 193 Ill.App.3d 339, 140 Ill. Dec. 9, 15, 549 N.E.2d 660, 666 (1989). Therefore, "'out-of-pocket' losses" are "recoverable if proved at trial, for they certainly flow directly from plaintiff's having acted on defendant's representations." *Id.* at 15–16, 549 N.E.2d at 666–67. Such losses would naturally include attorneys fees and reasonable compensation for the time and effort wasted in reliance upon misrepresentations.

■ By contrast, so-called "benefit-of-the-bargain" damages (as were awarded here) are available only under much narrower circumstances. The Restatement (Second) of Torts § 549(2) (1977) provides that:

the recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

Illinois, whose law we apply in this matter, has apparently adopted this standard. *See, e.g., Gold*, 140 Ill.Dec. at 15–16, 549 N.E.2d at 666–67; *Application of Busse*, 124 Ill. App.3d 433, 79 Ill.Dec. 747, 752, 464 N.E.2d 651, 656 (1984). Proof of injury resulting from the alleged fraud is an essential element in an action for fraud. *Id.* at 751, 464 N.E.2d at 655. However, benefit-of-the-bargain damages are limited to "situations where the transaction between the parties has actually been consummated based on the fraudulent misrepresentation." *Id.* at 762, 464 N.E.2d at 667; *see Beaton & Associates, Ltd. v. Joslyn Manufacturing & Supply Co.*, 159 Ill.App.3d 834, 111 Ill.Dec. 649, 655, 512 N.E.2d 1286, 1292 (1987) (court affirms the availability of benefit-of-the-bargain damages, stating that "[o]ne induced to *contract* through the fraud of another may elect to rescind the *contract* and recover the consideration paid, or affirm the *contract* and recover the difference between the property received and what he or she would have received but for the fraud") (emphasis added); Restatement (Second) of Torts § 549, Comment on Subsection (2) (1977). Where a misrepresentation induced the victim to consummate the bargain, benefit-of-the-bargain damages are appropriate to give the victim

the rewards he reasonably expected under the contract. Such damages are clearly not appropriate, however, in the absence of an actual, binding agreement. Damages for common law fraud are not intended to restore what one never had.

■ Here, Roboserve is entitled to recover for those out-of-pocket losses attributable to Kato's misrepresentations, including the loss of its time and resources in preparing proposals for adding new Robobars to the HRC. Testimony at trial indicated that Roboserve incurred $12,810 in attorney's fees and costs. We believe the evidence also indicates that officials at Roboserve, independent of its attorney, expended a substantial amount of time and effort preparing for and conducting negotiations with Hyatt, for which Roboserve deserves compensation. We assume the jury took this into account when calculating the damages and, in addition to the $12,810 in attorney's fees, awarded Roboserve $25,000 in out-of-pocket losses for the wasted time and effort of its employees.

■ The jury's $1 million verdict, however, went far beyond compensation for Roboserve's out-of-pocket losses. It obviously included benefit-of-the-bargain damages. But what bargain? There was a misleading contest that could have resulted in a contract for the winner. There were hints of Hyatt placing Robobars in a number of other hotels throughout the country. But this alleged fraud did not induce any contract. Yet, in his jury instructions on the fraud count, the judge stated that "[p]laintiff's compensatory damages may include the benefit of its bargain, which means that the plaintiff is entitled to be placed in the same financial position as it would have been in had the misrepresentations in fact been true." Under these facts, that instruction was wrong. Roboserve is not entitled to recover for the loss of contractual benefits it never actually secured. Nothing indicates that Roboserve ever consummated a deal giving it the right to additional HRC business, much less the broader Hyatt business. Roboserve does not even contend that Hyatt's misrepresentations gave rise to an enforceable contract obliging Hyatt to install

additional Robobars in the HRC and beyond, and the evidence does not appear to support such a contract. The most that has been shown is that through a misleading "contest" and "negotiations" that were designed to delay, Hyatt wasted Roboserve's time and efforts, induced it not to enforce its existing contractual right to install 100 more minibars, and unjustly raised its expectations of future business and profits. However objectionable, such mistreatment does not entitle Roboserve to damages for what might have been had it actually consummated a broader agreement with Hyatt. Even if Hyatt had acted in good faith (before and after Kato came along) the negotiations still may not have resulted in the contracts Roboserve sought. Thus there was no basis for an award of benefit-of-the-bargain damages.

Based on a jury instruction that did not conform with Illinois law, the jury's award of $1 million in compensatory damages for fraud is both "monstrously excessive" and "not rationally connected to the evidence" and thus "may be altered" by this court. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1554 (7th Cir.1990) ("Because fixing a damage award is an exercise in fact-finding, only those awards that are monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence may be altered."). It obviously included far more than compensation for lost time and effort—i.e., actual losses—due to the fraud. We find, therefore, that had the jury been instructed as to the proper formulation for determining compensatory damages, it would have limited its award to expenses and attorney's fees. Such an award would have amounted to no more than $37,810.

### 4. Punitive damages.

In its post-trial motion for judgment as a matter of law, Kato assailed the jury's $6 million punitive damages award as unwarranted and excessive. The district court reviewed its own decision to submit the question of punitive damages to the jury under an abuse of discretion standard. Given "Robo-serve's supported allegation of a multi-year cover-up," the court found "evidence of a pattern of conduct sufficient to state a legally cognizable claim for punitive damages" and so held that it did not abuse its discretion when it allowed the issue to go to the jury. *Roboserve, Inc.*, 873 F.Supp. at 1136. The district court also held that the amount of punitive damages awarded was not excessive as a matter of law under the three-factored analysis explicated by this court in *Hardin, Rodriguez & Boivin Anesthesiologists v. Paradigm Ins. Co.*, 962 F.2d 628, 640 (7th Cir.1992).[5] *Roboserve, Inc.*, 873 F.Supp. at 1142–43. On appeal, Kato renews its objections to the punitive damages award.

We review *de novo* the district court's denial of Kato's motion for judgment as a matter of law on the question of punitive damages. *Williams v. O'Leary*, 55 F.3d 320, 323 (7th Cir.), *cert. denied sub nom. Williams v. Brewer*, — U.S. —, 116 S.Ct. 527, 133 L.Ed.2d 434 (1995); *cf. Europlast, Ltd. v. Oak Switch Systems, Inc.*, 10 F.3d 1266, 1276 (7th Cir.1993) ("We review the district court's submission of punitive damages to the jury *de novo*."). Reversal is appropriate if we conclude that "there is no legally sufficient evidentiary basis for a reasonable jury to find" that the Illinois criteria for imposing punitive damages were met. Fed.R.Civ.P. 50(a)(1); *Thomas v. United States*, 41 F.3d 1109, 1113 (7th Cir.1994); *cf. Mayer v. Gary Partners & Co.*, 29 F.3d 330, 334 (7th Cir.1994) (standard for granting summary judgment in diversity cases "whether reasonable minds could deem the evidence adequate *under the governing [state] substantive rule*") (emphasis added).

"Illinois courts do not favor punitive damages and insist that plaintiffs must establish 'not only simple fraud but gross fraud, breach of trust, or other extraordinary or exceptional circumstances clearly showing malice or willfulness.'" *Europlast*, 10 F.3d at 1276 (quoting *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.*, 896 F.2d 1035, 1043

5. In *Hardin* we explained that "Illinois courts look to three factors in analyzing [the excessiveness of punitive damages]: (1) the nature and enormity of the wrong, (2) the financial status of the defendant, and (3) the potential liability of the defendant resulting from multiple claims." *Id.*

(7th Cir.1990)) (internal quotation marks omitted); *Cornell v. Langland*, 109 Ill.App.3d 472, 65 Ill.Dec. 130, 132, 440 N.E.2d 985, 987 (1982) (punitive damages are appropriate when conduct is "intentional, deliberate and outrageous"). The Illinois Supreme Court has noted that "[b]ecause of their penal nature, punitive damages are not favored in the law, and courts must be cautious in seeing that they are not improperly or unwisely awarded." *Deal v. Byford*, 127 Ill.2d 192, 130 Ill.Dec. 200, 205, 537 N.E.2d 267, 272 (1989). In *Cornell* the court explained: "The awarding of punitive damages originated as a means of punishing defendants in instances of malice, oppression or gross fraud, *i.e.*, where the manner of performance made the conduct outrageous." 65 Ill.Dec. at 132, 440 N.E.2d at 987. To justify punitive damages, the allegedly outrageous conduct must "involv[e] some element of outrage similar to that usually found in a crime." Restatement (Second) of Torts § 908, comment b (1979); *Loitz v. Remington Arms Co., Inc.*, 138 Ill.2d 404, 150 Ill.Dec. 510, 515, 563 N.E.2d 397, 402 (1990). And without evidence of gross fraud or some exceptional circumstance clearly indicating malice or willfulness—if the evidence demonstrates only a garden variety fraud—under Illinois law the question of punitive damages is not even submitted to the jury. *See Home Sav. & Loan Ass'n of Joliet v. Schneider*, 108 Ill.2d 277, 91 Ill.Dec. 590, 593, 483 N.E.2d 1225, 1228 (1985) ("deceit alone cannot support a punitive damage award"); *Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 23 Ill.Dec. 559, 566, 384 N.E.2d 353, 359 (1978) ("[T]he preliminary question of whether the facts of a particular case justify the imposition of punitive damages is properly one of law.").

Our review of the record does not reveal evidence of "gross," "wanton" or "malicious" conduct on the part of Hyatt or Kato. Rather than evidence of outrageous conduct, what emerges from a review of the facts is a picture of a highly competitive marketplace with sophisticated advocates on all sides jockeying for position and profit. Hyatt indeed played loose with its contractual obligations and was less than candid—and may even have lied—about its present actions and future plans. Yet despite the district court's

ominous characterization of Kato's conduct as a "multi-year cover-up," *Roboserve, Inc.*, 873 F.Supp. at 1136, we find in the record little more than simple deceit and obfuscation. For this Kato will pay a significant price, as shown in our analysis of the fraud, breach of contract, and wrongful termination issues.

But in Illinois "deceit alone cannot support a punitive damage award." *Schneider*, 91 Ill.Dec. at 593, 483 N.E.2d at 1228. That is especially so in a case like this, where the plaintiff had its own stratagems, including refraining for years from enforcing its contractual rights in the hope of landing a lucrative nationwide contract. What the record lacks is some indication that Hyatt or Kato intended to financially damage Roboserve. Without such evidence, the malice, wantonness or grossness that under Illinois law must characterize conduct justifying the imposition of punitive damages is absent. *See also Logsdon v. Graham Ford Co.*, 54 Ohio St.2d 336, 376 N.E.2d 1333, 1335 (1978) ("[E]xemplary [i.e., punitive] damages may properly be awarded where the plaintiff has suffered actual damages as a result of fraud *intentionally committed with the purpose of injuring him.*") (emphasis added); *Black's Law Dictionary* (6th Edition), "Malice": "The intentional doing of a wrongful act without just cause or excuse, *with an intent to inflict an injury* or under circumstances that the law will imply an evil intent." (Emphasis added.) Given the strong aversion of the Illinois courts toward punitive damages, we hold that a plaintiff seeking punitive damages under these circumstances must at least put forth some evidence of intent to injure; merely withdrawing business opportunities is not enough. *See Froud v. Celotex Corp.*, 107 Ill.App.3d 654, 63 Ill.Dec. 261, 266, 437 N.E.2d 910, 915 (1982) (Illinois jury instruction defines willful and wanton misconduct justifying punitive damages as "a course of action which shows actual or deliberate *intention to harm* or which, if not intentional, shows an utter indifference to or conscious disregard of a person's own safety and the safety of others.") (emphasis added); *Peterson v. Culver Educational Foundation*, 402 N.E.2d 448, 456 (Ind.App.1980) (Conduct meriting punitive damages is characterized

by a "consciousness of intended or probable effect calculated to unlawfully injure the personal safety or property rights of others. In some instances it may consist of the conscious desire to maximize rather than mitigate the amount of injury suffered. If one were to select a single word or term to describe this essence, it would be 'malice.'"). *Treadwell Ford, Inc. v. Lewis*, 416 So.2d 410, 417 (Ala.1982) (Torbert, C.J., dissenting) ("The rule [in Alabama] is and always has been 'that punitive damages may not be recovered in such an action (deceit) unless the fraud is gross, malicious, oppressive and is committed with an intention to so injure and defraud.' *Treadwell Ford, Inc. v. Leek*, 272 Ala. 544, 133 So.2d 24 (1961)."). To hold otherwise in this context would impermissibly obscure the distinction between fraud and gross fraud, between conduct meriting (ordinary) compensatory damages and conduct meriting (extraordinary) punitive damages.

Accordingly, since we can find no evidence of an intent to injure constituting gross misconduct or malicious behavior, we hold that the district court erred in denying Kato's motion for judgment as a matter of law on the question of punitive damages. *See Europlast*, 10 F.3d at 1276 (punitive damages award overturned on appeal because there was "little if any evidence of 'gross,' 'wanton' or 'malicious' conduct on the part" of the defendant). The compensatory damages Roboserve will take home from this action will sufficiently redress its actual losses. Without malicious conduct and intent to harm, Roboserve is not due additional sums for the fraud and deceit Kato committed.

### B. Breach of Contract

#### 1. Liability.

Kato attacks the verdict on the breach of contract count by arguing that the trial court erred in refusing to allow the jury to consider evidence in support of its affirmative defenses of waiver, failure to mitigate and estoppel. It further contends that the "reasonable endeavors" clause in the Agreement was too vague to be enforceable and thus could not be the basis for liability.

 We find no error in the district court's ruling in regard to Kato's proposed affirmative defenses. The Agreement contained an explicit non-waiver provision that could only be overcome through a separate written agreement signed by both parties.[6] Kato does not allege the existence of a written and signed waiver supporting its position, only that Roboserve's conduct (i.e., its failure to enforce its rights) relieves Kato from the strict terms of the non-waiver clause.

 As the district court correctly noted, non-waiver "clauses are enforceable [in] Illinois," *Monarch Coaches, Inc. v. ITT Industrial Credit*, 818 F.2d 11, 13 (7th Cir. 1987), and may be strictly construed even when full compliance with the contract has not been required for a lengthy period of time. *See, e.g., Transcraft Corp. v. Anna Indus. Dev. Corp.*, 223 Ill.App.3d 100, 165 Ill.Dec. 599, 601, 584 N.E.2d 1033, 1035 (1991) (non-waiver clause still binding though contract breached continuously for over twenty years). Nevertheless, it is still possible to waive such a clause. As we noted in *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 776 F.2d 198, 202 (7th Cir.1985), "the weight of authority in Illinois holds that Waiver Only in Writing provisions can be waived by [the] words and deeds of the parties, so long as the waiver is proved by clear and convincing evidence." Kato does not present such convincing evidence, and for this reason, and the additional reasons outlined in the district court's opinion, we hold that the non-waiver clause was fully enforceable. *See Roboserve, Inc.*, 873 F.Supp. at 1129–30. Therefore, the district

---

**6.** Section 19 of the Agreement provides: "The rights and remedies of the parties shall not be diminished waived or extinguished by the granting by one party of any indulgence forbearance or extension of time to the other party nor by any failure or delay by a party in asserting or exercising such rights or remedies." This clause is not iron-clad, however, for it is modified by section 26, which provides: "This Agreement and any other matters agreed in writing between the parties hereto in relation to the subject matter of this Agreement shall constitute the entire agreement between [Roboserve] and the [HRC] in relation to such subject matter and no variation to the same shall be binding on [Roboserve] unless in writing and signed by both parties."

court properly excluded Kato's evidence of waiver. Further, since the estoppel and mitigation defenses were nothing more than disguised claims of waiver, the district court was also correct to exclude evidence of these affirmative defenses. *Id.*

 Kato's complaints about the vagueness of the clause in the Agreement requiring it to use "reasonable endeavors" to promote Roboserve's bars are also unpersuasive. The clause may be somewhat vague, but it still has meaning. "Reasonable efforts" clauses are enforceable in Illinois. The question of what is "reasonable" under a contract is an issue of fact for the trier of fact. *See Honkomp v. Dixon,* 97 Ill.App.3d 476, 52 Ill.Dec. 740, 742, 422 N.E.2d 949, 951 (1981) ("Questions of reasonableness and good faith are generally issues of fact, entrusted for resolution to the trier of fact."). The evidence demonstrates that Kato could have placed Robobars in the more upscale Gold Passport rooms, but it did not. Kato also could have informed its guests of the Robobars and given them brief instructions as to their use, but it did not. At the very least, Kato could have refrained from establishing and promoting a competing product line within the HRC itself, but it did not. By agreeing to this provision, Kato was committed to a number of "endeavors" that it did not perform but that Roboserve (and the jury) could have considered reasonable. Whatever the precise affirmative duties of one bound to use "reasonable endeavors" to promote a product, the jury could reasonably have found that Kato had not complied. There is no reversible error in the jury's finding that Kato breached the contract.

### 2. Damages.

 Once again, however, we are forced to conclude that the amount of the jury's award of damages cannot be upheld. Of course, the "fixing of a damage award is an exercise in fact-finding" which should not lightly be disturbed on appeal. *Pincus,* 893 F.2d at 1554. But where an award of contract damages is "irrationally disproportionate" to the actual harm suffered—where a jury award leaves a party "in a dramatically better position than his rational expectations could have justified"—we are obliged to make appropriate corrections. *See id.* Such is the case here.

 "Damages recoverable under a breach of contract theory are based upon the mutual expectations of the parties. The basic principle for the measurement of contract damages is that the injured party is entitled to recover an amount that will put him in as good a position as he would have been in had the contract been performed as agreed." *Collins v. Reynard,* 154 Ill.2d 48, 180 Ill.Dec. 672, 673, 607 N.E.2d 1185, 1186 (1992); *Ollivier v. Alden,* 262 Ill.App.3d 190, 199 Ill.Dec. 579, 583, 634 N.E.2d 418, 422 (1994) (in determining contract damages, "it is fundamental that a monetary award should, to the extent possible, put the nonbreaching party in the position he would have been in had the contract been performed.") "However, a plaintiff is not entitled to a windfall." *Id.* at 584, 634 N.E.2d at 423; *Gaiser v. Village of Skokie,* 271 Ill.App.3d 85, 207 Ill.Dec. 749, 757, 648 N.E.2d 205, 213 (1995) ("The general rule of contract damages is that the person who is injured is to be placed in the position he would have been in had the contract been performed, *but not in a better position.*") (emphasis added). Therefore, Roboserve was entitled to contract damages in an amount equivalent to the difference between the benefits it actually received and those to which it was due under the Agreement—but no more.

 In a pretrial motion *in limine,* Kato reiterated these fundamental maxims of contract damages and requested the court to exclude as irrelevant evidence relating to Servi-System's profits. Kato argued that in the event a breach was found, Roboserve was entitled only to the profits it would have received had the contract been properly honored but not to revenues generated by the ServiBars.

The district court was not persuaded, however, and at trial the jury was permitted to hear testimony from Roboserve's expert that, between 1988 and 1993, $2,343,744 in Servi-Bar sales should have gone to Roboserve. The expert testified that the HRC contained 1870 in-room bars (900 Robobars and 970

ServiBars) and that of these "no more than 600" would be used on any given day. Since there were 900 Robobars in the HRC, and since there should have been 1000 under the contract, the expert continued, all of the 600 daily bar uses could have (and, under the contract, should have) occurred at Robobars. Therefore, had the contract been fully honored, all of the ServiBar sales would have gone to Robobars. The expert then explained how he took the estimated total revenues from those sales, adjusted for taxes, reduced the amount by 50% (the revenue sharing formula provided for in the Agreement), subtracted out maintenance costs, and added the interest specified in the Agreement for past-due payments. These calculations yielded an amount of $2,343,744, which the expert concluded was the total injury Roboserve suffered from Kato's breach of contract.

The jury was clearly persuaded by these numbers, awarding Roboserve $2.1 million in contract damages.[7] Yet a review of the numbers and the assumptions Roboserve's expert used confirms that the award cannot stand. The Agreement obligated Kato to install 1000 Robobars and to use "reasonable endeavors" to promote them. Roboserve's expert testified that of the total number of minibars installed by Roboserve and ServiBar, there were never more than 600 total uses each day in the HRC—a daily usage rate of approximately 32.1% (600 uses divided by 1870 total bars). The expert confirmed that this usage rate was more or less consistent with general usage rates of in-room bars nationally. Even had Kato done everything possible to promote 1000 Robobars, we cannot find any evidence whatsoever that Robobar usage could have been too much more than 30%. The jury evidently accepted the assumption of Roboserve's expert that the sales from all 600 daily bar uses could have been captured by 1000 rooms that should have had Robobars. But that assumption has no factual foundation. There is no evidence in the record suggesting that the "reasonable endeavors" Kato was required to use in promoting Robobars could have raised the bar-usage rate from an HRC *maximum* (according to

Roboserve's expert) of 32.1% to 60% (600 of 1000). Moreover, the jury's award for lost profits due to six years of partial performance of the contract was almost two and a half times what it awarded for the wrongful termination—$2,100,000 versus $850,000. In other words, the jury concluded that the value of five years of lost profits from a *total* breach—a termination—of the contract amounted to only 40% of what it determined Roboserve had lost over a six year period from a mere *partial* breach of the contract. Such a conclusion is obviously irrational and finds no support in the record.

Determining the proper amount of damages in this case is somewhat of a mathematical challenge. To note just one deficiency, missing from the record on appeal is a precise indication of Roboserve's per-unit profits, an essential figure for calculating appropriate compensation. Nevertheless, the numbers in the record do suggest a more reasonable, if still generous, damages award.

We have established that 900 of the 1000 Robobars were installed in the HRC but not properly promoted. Roboserve is therefore entitled to the profits it would have had if all 1000 Robobars had been installed and properly promoted as required by the Agreement. Roboserve's expert witness estimated that between 1988 and 1993 ServiSystem had $2,343,744 in sales that would otherwise have gone to Roboserve. In other words, he estimated that the contractual value to Roboserve of lost ServiBar sales amounted to $2,343,744. Working backwards we can calculate the per-use profit of each minibar. ServiBars were present in 970 rooms in the HRC. If we assume an average occupancy rate of 70%, then on average 679 (970 × .70) rooms with ServiBars were occupied each day. With 32.1% as the maximum usage rate for in-room bars (as Roboserve's expert testified), about 218 (679 × .321) uses of ServiBars occurred each day. This amounts to 477,420 ServiBar uses during the six years between 1988 and 1993 (218 uses per day × 365 days per year × 6 years = 477,420 uses over 6 years). Roboserve's expert estimated

---

7. Kato's failure to put on an expert witness of its own bolsters our conclusion that the jury relied on the figures presented by Roboserve's expert witness in calculating the contract damages.

the value to Roboserve of these 477,420 ServiBar uses at $2,343,744, or $4.91 per use. He also indicated that sales per unit from the ServiBars and Robobars were basically the same. Thus we assume that the profit from a Robobar sale or use was no more than $4.91.

Using these figures derived from Roboserve's expert, we can estimate Roboserve's actual profits. With 900 Robobars installed, and again assuming a 70% occupancy rate, 630 Robobar rooms (900 × .70) would have been occupied each day at the HRC. Again assuming the 32.1% usage rate supplied by Roboserve's expert, this implies there were about 202 uses of the Robobars each day (630 × .321), 73,730 each year (202 × 365 days per year), and 442,380 over the roughly six years of the contract (73,730 × 6 years). By these calculations, we estimate that Roboserve actually made about $2,172,086 in profits between 1988 and 1993 (442,380 uses × $4.91 per usage).

We now consider what Roboserve's profits should have been under the contract. Roboserve claims, in essence, that its usage rate would have been 60% had Kato used "reasonable endeavors" to promote its bars. As noted, we find this assertion to be without support in the record, in clear contradiction of the testimony of its own expert, and highly improbable. Nevertheless, the jury found that Kato breached the Agreement, and we have assumed this means it found Kato did not put forth appropriate efforts to promote Robobars. Accordingly, we also assume the jury determined that had Kato used "reasonable endeavors" to promote Robobars, at least some increase in Robobar sales would have occurred. Although an increase to 60% is implausible, we believe it is possible—and assume for purposes of calculating damages—that Robobar sales could have increased to as much as 40% of occupied rooms. Moreover, we assume that a proper promotion of Robobar rooms would also have increased the occupancy rate of Robobar rooms to about 75% from 70%.

Using the figures derived above and the assumptions just stated, Roboserve would have reaped $3,225,870 in profits if 40% of the guests in occupied Robobar rooms had used their Robobars.[8] The difference, therefore, between what we assume Roboserve received in profits ($2,172,086 with a 32.1% usage rate) and what it could maximally have expected under the contract ($3,225,870 with a 40% usage rate) is $1,053,784.

We acknowledge the relative imprecision of the above calculations. Since Kato chose not to offer its own estimates of Roboserve's contract losses, our calculations were necessarily limited to the numbers provided by Roboserve's expert. Where there was doubt, we have erred on the side of Roboserve in deference to its victory at trial. Thus, our estimation that Roboserve suffered $1,053,784 in losses due to Kato's breach is undoubtedly generous. What it conclusively reveals, however, is that the jury's award of $2.1 million was out of all proportion to the actual injury Roboserve sustained. Roboserve was never entitled to all of ServiSystem's profits. Its damages award should have been limited to the losses it suffered due to Kato's failure to properly promote the 1000 Robobars called for in the Agreement. Using Roboserve's own estimates of per unit profits, we hold that such losses could not have been more than $1,053,784.

## C. Wrongful Termination

### 1. Liability.

■■■ Kato contests the jury's determination that it wrongfully terminated the Agreement. Throughout, Roboserve has maintained that due to delays in installation, the original Agreement was modified so that the five-year contract period would not begin until all 1000 Robobar units had been installed. Thus, when Kato terminated the contract with only 900 Robobars installed, it actually terminated before the contract began. Hence, it became liable for five years of Roboserve's lost profits. Kato vigorously denies that the Agreement was ever amended, pointing to a clause in the Agreement

---

8. 1000 rooms × 75% occupancy rate = 750 occupied rooms per day × 40% usage = 300 uses per day × 365 days per year = 109,500 uses per year × 6 years = 657,000 uses over the 6 years of the contract × $4.91 per usage profit = $3,225,870 profit.

requiring a writing signed by both parties for any valid modification. (See footnote 7 *supra* for the text of the Amendment Only in Writing clause.) In Kato's view, no such writing was ever effected and thus no amendment occurred, with the result that there was no wrongful termination. Kato also argues that since the Robobars remain in the HRC, its letter of December 14, 1992 terminating the Agreement was not a positive and unequivocal repudiation of the contract. In response, Roboserve contends that a signed letter from Kato affirming the amended Agreement confirms its binding authority. Alternatively, Roboserve argues that Kato waived the Amendment Only in Writing clause through its words and deeds, including terminating the Agreement only after it believed the amended Agreement was about to run its course. Lastly, Roboserve responds that the plain language of the December 14 letter unequivocally terminated the Agreement.

The district court engaged in a thorough and extensive review of these arguments in its memorandum opinion and concluded that the parties satisfied the Amendment Only in Writing clause; that there was sufficient evidence to support the jury's finding that Kato waived that clause; that the amended Agreement satisfied the Illinois Statute of Frauds (an issue not raised on appeal); and that Kato accepted Roboserve's offer to amend within a reasonable time period. *Roboserve, Inc.*, 873 F.Supp. at 1130–33. For the reasons stated in the district court's thorough discussion, we hold that the amended Agreement governed the parties' duties. And because the amended Agreement specified that the five-year contract period would not begin until all 1000 Robobars had been installed, which to this day has not occurred, and because the December 14 letter of termination was unequivocal, we also hold that the jury's determination that Kato wrongfully terminated the Agreement was not incorrect as a matter of law.

*2. Damages.*

As with the other damages awards, Kato disputed the jury's award of $850,000 for wrongful termination in its post-trial motion on the ground that it was excessive and that, in any event, the jury calculated it based on an incorrect starting date. The district court denied that the award was excessive as a matter of law, but agreed with Kato that the jury had used the wrong starting date in its calculations and so remitted $127,500 of the award, reducing it to $722,500. *Id.* at 1143–44. On appeal, Kato contends that even as remitted the award was illegitimately based on ServiBar profits and thus should be further remitted by at least 50%.

In contrast to the other damages awards, we cannot say that the award of $722,500 is grossly disproportionate to the actual injury Roboserve suffered from the wrongful termination. We held above that the facts in the record could support an award (albeit generous) of $1,053,784 for Kato's failure to honor the Agreement over a six year period. In comparison to that amount, an award of $722,500 for termination of the Agreement five years early is not clearly excessive and therefore must stand.[9]

### III. Conclusion

In sum, we affirm the jury's finding of liability on the fraud, breach of contract, and wrongful termination counts, but vacate the award of damages for fraud (including punitive damages) and breach of contract and remand for a new trial on those issues unless Roboserve accepts a remittitur as specified above.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

RIPPLE, Circuit Judge, concurring in part and dissenting in part.

To the extent that the majority formulates the standard for imposing punitive damages

---

9. Kato may have a point in claiming that Roboserve's expert presented figures inflated with ServiBar proceeds. But when compared to the now-reduced award for the six-year breach of contract, the five-year contract termination award is relatively small. By not presenting competing expert testimony, Kato leaves us only with Roboserve's calculations. And their expert testified by referring to charts and documents that the jury observed but for some reason were not made part of the record. So these inflated and somewhat inconsistent figures are the result of Kato's own decisions at trial.

282

for fraud as limited to situations in which a single factor—"intent to injure"—is present, I respectfully dissent.

Read in their entirety, the decisions of the Illinois courts suggest that the presence of other aggravating circumstances, many of which do not rise to the level of an intent to injure, will justify the imposition of punitive damages for fraud. *E.g., Martin v. Heinold Commodities, Inc.*, 163 Ill.2d 33, 205 Ill.Dec. 443, 466, 643 N.E.2d 734, 757 (1994) (noting that "punitive damages are permissible where a duty based on a relationship or trust is violated and where the violation has been willful"). The cases suggest that one such aggravating circumstance is a pattern of reprehensible conduct of the type engaged in by Hyatt in the present case. *See Kleidon v. Rizza Chevrolet, Inc.*, 173 Ill.App.3d 116, 122 Ill.Dec. 876, 527 N.E.2d 374 (1988) (punitive damages reversed where "the record does not establish a pattern of bad faith by [the defendant] during its dealings with plaintiffs"); *Four "S" Alliance, Inc. v. American Nat'l Bank & Trust Co. of Chicago*, 104 Ill.App.3d 636, 60 Ill.Dec. 314, 318, 432 N.E.2d 1213, 1217 (1982) (punitive damages upheld where misrepresentations were repeated at various stages of the negotiations and were material to plaintiffs' ongoing business decisions). Indeed, this court recognized the availability of punitive damages for such conduct in *West v. Western Casualty & Surety Company*, 846 F.2d 387 (7th Cir. 1988), where we concluded that "the jury was entitled to conclude that [defendant's] conduct was deliberate and purposeful, orchestrated by responsible management over a significant period of time." *Id.* at 398.

Although I do not join the majority's conclusion that total abrogation of punitive damages on the fraud count is appropriate, it is clear that the amount of the award must be reassessed. The jury was permitted to consider evidence, decide issues, and award damages based on evidence of "Hyatt business" from hotels other than the HRC. The district court took the view that the jury had not awarded damages for fraud beyond the confines of the HRC, but following, as we must, the presumption that jurors follow the instructions given to them, *e.g., Downes v.*

*Volkswagen of America, Inc.*, 41 F.3d 1132, 1144 (7th Cir.1994); *Sokol Crystal Prods., Inc. v. DSC Communications Corp.*, 15 F.3d 1427, 1433 (7th Cir.1994), I would remand the award of punitive damages on the fraud count for redetermination.

Remand is also the appropriate course with respect to damages on Roboserve's claim for breach of contract. The majority correctly concludes that the jury's award cannot be supported by the record, but an appropriate division of responsibility between the court of appeals and the district court requires that a determination of the proper amount be conducted, in the first instance, by the trier of fact. I would, therefore, remand this issue as well.