**Sheila RHEINECK, Plaintiff,**

v.

**HUTCHINSON TECHNOLOGY INCORPORATED,**
**Defendant.**

**No. 99CV616.**

United States District Court,
D. Minnesota.

Aug. 18, 2000.

Jennie Brown, Esq., Brown Law Office, Minnetonka, MN, for Plaintiff.

Steven R. Anderson, Esq. and Holly M. Robbins, Esq., Faegre & Benson, Minneapolis, MN, for Defendant.

## MEMORANDUM OPINION AND ORDER

FRANK, District Judge.

### Introduction

Plaintiff Sheila Rheineck sued her employer, Hutchinson Technology Incorporated ("HTI") for sexual harassment and retaliation under Title VII. The Plaintiff also set forth several common law tort claims as well as a claim for breach of contract, all arising out of the circulation in the workplace of a picture of a topless woman that resembled the Plaintiff and the em-

ployer's alleged promise to announce to its employees that the picture was not of the Plaintiff.

The matter is currently before the Court pursuant to the Defendant's Motion for Summary Judgment. For the reasons stated, the Defendant's Motion is granted.

**Background**

Defendant HTI designs and manufactures components for computer disk drives. (Affidavit of James Fry at ¶ 3.) As of May 31, 1998, HTI had approximately 1,200 employees working at its manufacturing facility in Eau Claire, Wisconsin. (Fry Aff. at ¶ 3.) However, by the end of 1998, approximately 1,550 employees worked at HTI's Eau Claire facility. (Fry Aff. at ¶ 3.)

Plaintiff Sheila Rheineck is, and during the relevant time period was, a manufacturing supervisor at HTI's Eau Claire facility. (Deposition of Sheila Rheineck at p. 34.) The Plaintiff is the manager of approximately 30 employees. (Rheineck Dep. at p. 41.)

On the morning of May 31, 1998, supervisor Mark Buchli confiscated a picture from one of HTI's employees. (Deposition of Mark Buchli at pp. 13–14; Affidavit of Carol Mitchell at ¶ 4.) The picture in question depicted a topless woman; although the picture in question was not of the Plaintiff, the woman depicted strongly resembled the Plaintiff. (Rheineck Dep. at pp. 87, 91.)

Mr. Buchli had never seen or heard about the picture before. (Buchli Dep. at p. 16.) All four of the supervisors who were working at the facility that day gathered that same morning to discuss what was going to be done about the picture. (Buchli Dep. at pp. 17–18.) The four supervisors discussed the best way to handle the situation and decided to talk to the unit coordinators on the manufacturing floor to determine if there were any more pictures circulating and to find out if any-

one else had seen the picture. (Buchli Dep. at p. 19.) The managers further instructed the coordinators that, if they found any type of pornographic materials, they were to bring the materials to the supervisors immediately. (Buchli Dep. at p. 22.) The supervisors decided that any additional copies of the picture would be destroyed. (Buchli Dep. at p. 40.)

Later that morning, Mr. Buchli called Carol Mitchell, HTI's manufacturing manager, at home. (Buchli Dep. at pp. 20–21; Mitchell Aff. at ¶ 4.) Mr. Buchli informed Ms. Mitchell that he had seen a pornographic picture at the facility that bore a resemblance to the Plaintiff. (Buchli Dep. at p. 21.) Mr. Buchli explained to Ms. Mitchell that he and the other supervisors were addressing the situation by investigating whether any other pictures were circulating and instructing the coordinators to bring any such pictures to the supervisors immediately. (Buchli Dep. at p. 22; Mitchell Aff. at ¶ 4.) Ms. Mitchell concluded that the supervisors were acting appropriately and advised Mr. Buchli that she concurred with the plan. (Buchli Dep. at p. 22; Mitchell Aff. at ¶ 4.)

Later that day, another employee brought one additional copy of the same picture to the supervisors. (Buchli Dep. at p. 22.) Mr. Buchli destroyed the additional copy and gave the first copy to Ms. Mitchell. (Buchli Dep. at p. 40.)

The supervisors also spoke with an additional employee whom the supervisors had heard had the picture on his computer screen. (Buchli Dep. at pp. 25–27.) The supervisors asked the employee if he had seen or was in possession of a pornographic picture, and the employee replied in the negative. (Buchli Dep. at p. 26.) The supervisors did not see the picture on the employee's monitor. (Buchli Dep. at p. 28.)

At the shift change that evening, Mr. Buchli alerted the oncoming manager as to the situation and advised him to please follow through with the plan and remove any pictures that were discovered. (Buchli Dep. at p. 33.)

The Plaintiff was not at work on that date and first learned of the picture when Mr. Buchli telephoned her at home that same day. (Buchli Dep. at p. 19; Rheineck Dep. at p. 60.)

The next day, on Monday, June 1, 1998, the Plaintiff went to Ms. Mitchell's office to speak to her about the matter. (Rheineck Dep. at p. 76.) Ms. Mitchell wasn't in her office, so the Plaintiff went to speak with Peggi Stamm at Human Resources. (Rheineck Dep. at pp. 76–77.) Ms. Stamm referred the Plaintiff to James Fry, the Human Resources manager. (Rheineck Dep. at p. 77.)

The Plaintiff was concerned that HTI employees erroneously believed that she had posed for a topless picture. The Plaintiff testified that Mr. Fry told her not to worry, that the matter would be investigated thoroughly, and that her name would be cleared. (Rheineck Dep. at p. 78.) Specifically, the Plaintiff testified that Mr. Fry told her that a statement would be put out to clear her name .[1] (Rheineck Dep. at p. 78.)

Immediately after meeting with the Plaintiff, Mr. Fry called a management meeting between himself, Ms. Stamm, and the managers on duty to address the situation. (Fry Aff. at ¶ 7; Rheineck Dep. at p. 79.) The managers were told to find out what they could in terms of the picture's origin and in identifying how the picture was circulated. (Fry Aff. at ¶ 7.) It was decided that all copies were to be turned in

to Ms. Stamm no later than 11:00 that morning, and anyone caught in possession of the picture after that time would receive corrective action. (Fry Aff. at ¶ 7.)

Evidence appears in the record that at least one manager varied from this direction by sending an e-mail to his employees immediately after the meeting, directing them that they had until 5:00 p.m. that day to eliminate any inappropriate materials in their possession:

> An incident has been brought to my attention regarding the distribution of nude photographs. As I know you are all well aware, this type of behavior is not acceptable and cannot be tolerated. If you have any inappropriate materials (E-mail, bitmap files, hard copies etc.), you have until 5:00 PM today to either destroy them or turn them in to me . . . . Please understand that this is an extremely serious issue and violations will result in corrective action up to and including termination.

(Stamm Aff., Ex. 10.)

That same day, Mr. Fry instructed HTI's support service manager to perform a scan of the facility's computer system to look for the picture. (Fry Aff. at ¶ 8.) The picture was found on several employees' computers. (Fry Aff. at ¶ 8.) Those employees were disciplined, as discussed below.

Neither the Plaintiff nor HTI management was ever aware of the picture being circulated again, after June 1, 1998, one day after HTI management first learned of the picture's existence. (Rheineck Dep. at p. 173; Fry Aff. at ¶ 10; Stamm Aff. at ¶ 11.)

---

1. Mr. Fry testified that he told the Plaintiff that the matter would be investigated promptly and that the picture would be removed from the floor. (Affidavit of James Fry at ¶ 6.) Mr. Fry denies, however, that he told the

Plaintiff that an announcement would be made regarding the picture. (Fry Aff. at ¶ 11.) For purposes of the present summary judgment motion, the Plaintiff's testimony will be accepted as true.

Mr. Fry also discussed with Ms. Stamm and Plant Manager Kathleen Skarvan the Plaintiff's request for a plant-wide announcement that the picture was not of her. (Fry Aff. at ¶ 11; Rheineck Dep. at p. 137.) It was decided that an announcement about the picture would create more curiosity and rumors than it would dispel, particularly because management was of the belief that most employees at the facility had not seen or heard about the picture. (Fry Aff. at ¶ 11.) Mr. Fry concluded that the best course of action was to allow the discussion of the picture to taper off once the picture had been eliminated and employees had been warned against having inappropriate materials in the workplace.[2] (Fry Aff. at ¶ 11.)

Pursuant to the managers' investigation, within a few days of the June 1, 2000, meeting, HTI had identified nine employees who either had circulated the picture or had copies of the picture on their computers. (Stamm Aff. at ¶ 5.) Regarding the picture's origin, a control technician admitted that he had discovered the picture on a disk in a computer that had come from the HTI facility in Hutchinson, Minnesota, and had given the picture to another employee.[3] (Stamm. Aff. at ¶ 5.) All nine employees were required to take additional sexual harassment training and were disciplined as follows. (Stamm Aff. at ¶ 8.)

HTI has a progressive corrective action system, which may be subject to variation based upon the seriousness of the conduct in question. (Stamm Aff. at ¶ 6.) Normally, a first infraction of HTI's rules results in a discussion between the employee and the employee's supervisor. (Stamm Aff. at ¶ 6.) The next corrective action step is usually an oral warning, which is not typically documented in the employee's personnel file. (Stamm Aff. at ¶ 6.) The next corrective action step is a written warning, which is documented in the employee's personnel file. (Stamm Aff. at ¶ 6.) The next step is probation, followed by termination. (Stamm Aff. at ¶ 6.)

One employee who had been placed on probation more than four years earlier for inappropriate behavior was placed on probation again. (Stamm Aff. at ¶ 7.) Five employees who had circulated the picture received written warnings, thereby skipping the usual first two disciplinary steps. (Stamm Aff. at ¶ 7.) Three employees who had simply possessed the picture received oral warnings, which were documented in their personnel files. (Stamm Aff. at ¶ 7.) All of the warnings contained the following statement:

---

**2.** The Plaintiff testified that she also asked Ms. Mitchell to make a statement that the picture was not of the Plaintiff and that Ms. Mitchell agreed to do so. (Rheineck Dep. at pp. 266–67.) When no statement was made by management, the Plaintiff talked to the employees whom she supervised herself and told them she was not the person in the picture. (Rheineck Dep. at p. 268.)

**3.** After the control technician had stated that he had found the picture on a disk in a computer that had come from the HTI facility in Hutchinson, Minnesota, Mr. Fry called the Human Resources manager at the Hutchinson facility and asked her to investigate the picture's origin. (Fry Aff. at ¶ 9.) The manager contacted the Hutchinson equipment manager, apprised him of the situation, and asked if it could be determined who put the picture on the disk or put the disk in the computer in Hutchinson. (Affidavit of Dwight Bordon at ¶ 4.) After consulting with his subordinates, the equipment manager concluded that it would not be possible to determine the origin of the disk or the picture, as any number of people could have left the disk in the computer; simply put, too many people had had access to the computer, both before and after the computer had been acquired by HTI. (Bordon Aff. at ¶ 5.) Mr. Fry was advised accordingly. (Fry Aff. at ¶ 9.)

Due to the seriousness of your actions this warning will stay in your file indefinitely. Any further incident relating to a sexual harassment policy violation any time in the future could result in further corrective action up to and including termination.

(Stamm Aff. at ¶ 7, Ex. 1.)

Additionally, HTI required the three employees who had started the distribution of the picture to apologize to the Plaintiff in person, which occurred on Friday, June 5, 1998. (Stamm Aff. at ¶ 9; Rheineck Dep. at p. 149.)

The Plaintiff testified that none of the nine employees who were disciplined exhibited any behavior that she felt was harassing after June 5, 1998. (Rheineck Dep. at pp. 173–75.) However, the Plaintiff testified that she perceived the continuing "gawking and talking and the rumors" at work in general to be harassing, particularly the continued misperception that she was the person in the photograph. (Rheineck Dep. at p. 176.)

The Plaintiff testified that the picture continued to be a topic of discussion. (Rheineck Dep. at pp. 110–13.) The Plaintiff stated that approximately half of the conversations about the picture she initiated herself. (Rheineck Dep. at p. 111.) The Plaintiff also stated that other conversations consisted of employees merely expressing their support and sympathy for the Plaintiff:

[J]ust in passing people would ask how I am doing. And I would say "fine." And they would say, "I am so sorry about the picture." And that would be the end of the conversation.

(Rheineck Dep. at p. 111.) The Plaintiff did not find the supportive statements to be offensive. (Rheineck Dep. at p. 111.)

However, the Plaintiff identified several instances that she found to be offensive. For example, the Plaintiff testified that one employee told her that an employee named Judy Geissler had told employees that the Plaintiff "can say what she wants to say, but I will believe what I want to believe." (Rheineck Dep. at pp. 112–13.) The Plaintiff was also offended when she learned, via employee Julie Alf, that employees in another department had been talking about the picture. (Rheineck Dep. at pp. 115–16.) The Plaintiff reported several instances in which she heard that people outside HTI had been talking about the picture; for example, the Plaintiff testified that the Plaintiff's sister and the Plaintiff's neighbor heard about the picture from other sources. (Rheineck Dep. at pp. 122–29.) The Plaintiff also testified that Linda Schaefer, a unit coordinator, told the Plaintiff that, when Ms. Schaefer was paying a bill at a store in the neighborhood, the store clerk, who was a former HTI employee, began talking about the picture. (Rheineck Dep. at pp. 117–18.) The Plaintiff testified that the continuing situation caused her acute distress. (Rheineck Dep. at p. 196.)

In March of 1998, the Plaintiff had received a good performance review. (Mitchell Aff. at ¶ 8.) However, soon thereafter, and before the incident with the pornographic picture, management received complaints regarding the Plaintiff. (Mitchell Aff. at ¶ 8 .) Mr. Buchli and David Searles, another supervisor, complained to Ms. Mitchell that the Plaintiff was frequently missing from her supervisory area and that the Plaintiff's supervisory employees asked them questions regarding her whereabouts. (Buchli Dep. at p. 67; Deposition of David Searles at pp. 22–23; Mitchell Aff. at ¶ 8 .) Mr. Searles reported to management that he and Mr. Buchli frequently had to cover for the Plaintiff when she could not be found. (Searles Dep. at pp. 27–28.)

The Plaintiff concedes that, after the picture incident, she began to have trouble

focusing on her work. (Rheineck Dep. at p. 193.) In October of 1998, Ms. Mitchell met with the Plaintiff to discuss the need for improvement with the Plaintiff's performance. (Rheineck Dep. at p. 194; Mitchell Aff. at ¶ 9.) Ms. Mitchell informed the Plaintiff that she needed to improve her attendance and to be more aware and involved as to what was going on in her unit. (Rheineck Dep. at p. 195.) The Plaintiff described that Ms. Mitchell was very empathetic regarding the Plaintiff's situation during the meeting. (Rheineck Dep. at p. 196.)

According to Ms. Mitchell, the Plaintiff's performance did not improve. (Mitchell Aff. at ¶ 9.) The Plaintiff continued to be frequently absent and apathetic. (Mitchell Aff. at ¶ 9.) In December, the Plaintiff was placed on a Performance Improvement Plan ("PIP"). (Rheineck Dep. at p. 202; Mitchell Aff. at ¶ 9.) Ms. Mitchell and the Plaintiff set goals for the Plaintiff in the areas of commitment, knowledge of product line, time management, and professionalism. (Mitchell Aff. at ¶ 9, Ex. 1.) Ms. Mitchell gave the Plaintiff a worksheet on which the Plaintiff prepared a plan to meet the goals set. (Rheineck Dep. at pp. 206–07; Mitchell Aff. at ¶ 9.)

Although the Plaintiff's performance improved during the time period immediately following the PIP, her performance then regressed. (Mitchell Aff. at ¶ 10.) Ms. Mitchell began to receive the same complaints about the Plaintiff regarding excessive absences and being uninvolved in her unit. (Mitchell Aff. at ¶ 10.) At the Plaintiff's yearly review, Ms. Mitchell discussed with the Plaintiff the perceived continuing problems with her attendance and commitment, and the Plaintiff did not receive a raise for the year. (Rheineck Dep. at pp. 214–16; Mitchell Aff. at ¶ 10.)

The Plaintiff commenced the present action as follows: Count One, Sexual Harassment Under Title VII; Count Two, Defamation; Count Three, Intentional Infliction of Emotional Distress; Count Four, Negligent Infliction of Emotional Distress; Count Five, Breach of Contract; Count Six, Retaliation Under Title VII; and Count Seven, Negligent Supervision.

## Discussion

### A. Standard of Review

Summary judgment is proper if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). *Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir.1996). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank*, 92 F.3d at 747. However, as the Supreme Court has stated, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Fed.R.Civ.P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must then demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir.1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Krenik*, 47 F.3d at 957.

## B. Count One: Sexual Harassment Under Title VII

■ A plaintiff may establish a Title VII violation by proving that discrimination based on sex has created a hostile or abusive work environment. *Rorie v. United Parcel Service, Inc.,* 151 F.3d 757, 761 (8th Cir.1998), quoting *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). However, sexual harassment by a co-employee is not a violation of Title VII unless the employer knew or should have known of the harassment and failed to take immediate and appropriate corrective action. *Hubbard v. United Parcel Service,* 200 F.3d 556, 558 (8th Cir.2000), quoting *Barrett v. Omaha Natl. Bank,* 726 F.2d 424, 427 (8th Cir. 1984).

■ An employer is not liable if it takes prompt remedial action that is reasonably calculated to end the harassment. *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F.3d 958, 967 (8th Cir.1999). Factors in assessing the reasonableness of remedial measures may include the amount of time that elapsed between the notice and remedial action and whether or not the measures ended the harassment. *Carter v. Chrysler Corp.,* 173 F.3d 693, 702 (8th Cir.1999).

■ In the present matter, supervisors first learned about the existence of the picture on May 31, 1998. There is no evidence in the record to establish that HTI should have known about the picture any earlier; indeed, the Plaintiff herself did not know of the picture before management informed her that night. The supervisors on duty immediately investigated whether any other pictures were circulating and confiscated the one additional copy that was found. There is no evidence in the record that the picture was circulated after June 1, 1998, one day after management first learned of the picture's existence.

An investigation was immediately undertaken to discover who was in possession of the picture and who had been involved in the picture's circulation. Within a few days, nine employees were identified who had either circulated the picture or had copies on their computers. All nine employees were disciplined; one was placed on probation, and the other eight were given either written or oral warnings, which were placed in their personnel files. The warnings contained a notice that "[a]ny further incident relating to a sexual harassment policy violation any time in the future could result in further corrective action up to and including termination." The employees were also required to take additional sexual harassment training. Finally, the three employees who had begun the picture's distribution were required to apologize to the Plaintiff in person, on Friday, June 5, 1998. The Plaintiff testified that none of the nine employees exhibited any behavior that she felt was harassing after June 5, 1998.

In consideration of the immediacy and the extent of the steps taken and their effectiveness, the evidence establishes that HTI took prompt remedial action that was reasonably calculated to end the harassment. *See Zirpel v. Toshiba America Information Systems, Inc.,* 111 F.3d 80, 81 (8th Cir.1997) (employer was entitled to summary judgment where employee never bothered plaintiff again after receiving written warning stating that "future acts of this type will result in additional disciplinary action up to and including immediate termination"). As HTI took appropriate corrective action once HTI knew or should have known of the pornographic picture, HTI cannot be held liable for sexual harassment under Title VII.

Although the picture was never circulated again, the Plaintiff testified that she felt

harassed by the continuing gossip and rumors that she had posed topless.

In determining whether the work environment is hostile or abusive under Title VII, courts must examine the totality of the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 (8th Cir.1998), quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). To be actionable, the conduct must have been sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Hathaway v. Runyon*, 132 F.3d 1214, 1221 (8th Cir.1997), quoting *Harris*, 510 U.S. at 21, 114 S.Ct. at 370. The plaintiff must show both that the offending conduct created an objectively hostile environment and that she subjectively perceived her working conditions as abusive. *Hathaway*, 132 F.3d at 1221. Title VII does not create a cause of action for all unpleasant or abusive behavior in the workplace. *Hathaway*, 132 F.3d at 1221.

The Plaintiff testified that, even after the picture was removed, discussions regarding the picture continued to be a daily occurrence. However, the Plaintiff admits that she initiated at least half of the conversations herself. The Plaintiff further revealed that, of those conversations that were initiated by others, many consisted solely of supportive and sympathetic comments, which the Plaintiff did not find offensive. In fact, the Plaintiff's testimony contained almost no incidents of derogatory or suggestive comments made in the Plaintiff's presence. Instead, the Plaintiff described that employees would report to her regarding derogatory, offensive, or merely gossip-related comments that other employees had supposedly made about the Plaintiff outside of her presence. Although the Plaintiff was offended that people were talking about her and was offended that people believed that she was the person in the picture, most of these comments and conversations consisted of numerous levels of hearsay, often involving persons and conversations outside of HTI's facility.

First, inadmissible hearsay evidence alone may not defeat a summary judgment motion. *Firemen's Fund Ins. Co. v. Thien*, 8 F.3d 1307, 1310 (8th Cir. 1993). More fundamentally, however, HTI cannot be liable for sexual harassment under Title VII based upon conversations that occurred outside of HTI's facility or upon comments made by those who were not employees. Although the Plaintiff clearly felt harassed, the situation described in the Plaintiff's deposition mainly consists of well-meaning persons reporting to the Plaintiff what was being said about her outside of her presence, often at her request.

Although the Plaintiff may have subjectively believed that she was being harassed, the objective prong of the sexual harassment standard has not been met. HTI is entitled to summary judgment accordingly.

**C. Count Six: Retaliation Under Title VII**

Title VII prohibits employers from retaliating against an employee because the employee "has opposed any practice made an unlawful employment practice." 42 U.S.C. § 2000e–3(a). *Artis v. Francis Howell North Band Booster Assoc., Inc.*, 161 F.3d 1178, 1182–83 (8th Cir.1998). To establish a prima facie case of retaliation under Title VII, a plaintiff must show that: (1) she engaged in statutorily protected activity; (2) she suffered

an adverse employment action; and (3) there was a causal connection between the two. *Smith v. Riceland Foods, Inc.,* 151 F.3d 813, 818 (8th Cir.1998), citing *Stevens v. St. Louis Univ. Med. Ctr.,* 97 F.3d 268, 270 (8th Cir.1996).

■ Once the plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to produce some legitimate non-discriminatory reason for the adverse action. *Buettner v. Arch Coal Sales Co., Inc.,* 216 F.3d 707, 714 (8th Cir.2000). If the employer satisfies this burden, the plaintiff must prove the proffered reason is a pretext for retaliation. *Buettner,* 216 F.3d at 714.

■ In the present matter, disregarding whether Plaintiff could establish a prima facie case, HTI has set forth evidence in the record showing legitimate, non-discriminatory reasons for placing the Plaintiff on a Performance Improvement Plan and then denying her a raise. Even before the incident with the picture, supervisors complained to management about the Plaintiff's excessive absenteeism and unawareness of circumstances in her unit. (Mitchell Aff. at ¶ 8; Buchli Dep. at p. 67; Searles Dep. at pp. 22–23.) Other supervisors had to cover for the Plaintiff and had to answer the questions of the Plaintiff's supervisory employees. (Searles Dep. at pp. 27–28.) After the picture appeared at the facility, the Plaintiff admits that her performance deteriorated. (Rheineck Dep. at p. 193.) Although, as the Plaintiff concedes, management was empathetic regarding the Plaintiff's situation, management nevertheless informed the Plaintiff that her performance required improvement. (Rheineck Dep. at pp. 195–96.) When improvement was not forthcoming or proved temporary, the Plaintiff was first placed on a Performance Improvement Plan and then denied a yearly raise. (Mitchell Aff. at ¶¶ 9–10.)

The Plaintiff has set forth no evidence in the record to show that HTI's reasons for the adverse employment actions were mere pretext. In the face of HTI's legitimate non-discriminatory reasons for its actions, and in the absence of any contrary evidence from the Plaintiff, the Plaintiff's retaliation claim must be dismissed.

**D. Counts Two through Four and Count Seven: State Torts**

The Defendant argues that the Wisconsin Workers Compensation Act ("WCA"). preempts the Plaintiff's common law tort claims. The Plaintiff argues for the application of Minnesota law, under which her claims would not be preempted.

**1. Choice of Law**

■ A federal court must apply the choice of law rules of the forum state, in this case, Minnesota. *Northwest Airlines, Inc. v. Astraea Aviation Services, Inc.,* 111 F.3d 1386, 1393 (8th Cir.1997), citing *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941). Under Minnesota law, the first issue that must be resolved before choosing between Wisconsin and Minnesota law is whether the law at issue is substantive or procedural. *Nesladek v. Ford Motor Co.,* 46 F.3d 734, 736 (8th Cir.), *cert. denied,* 516 U.S. 814, 116 S.Ct. 67, 133 L.Ed.2d 28 (1995). If the law is procedural, then the law of the forum state is applied. *Nesladek,* 46 F.3d at 736. If, on the other hand, the law is substantive, the choice of law analysis continues to the next step. *Nesladek,* 46 F.3d at 736. Minnesota law controls the substantive/procedural determination. *Nesladek,* 46 F.3d at 736.

■ A law is substantive if it will substantially affect the result. *Gate City Fed. Sav. & Loan Assn. v. O'Connor,* 410 N.W.2d 448, 450 (Minn.Ct.App.1987). In the present matter, Wisconsin law pre-

cludes the Plaintiff's state law tort claims, while Minnesota law does not. Therefore, as the outcome of the Plaintiff's claims would be substantially affected, the law in question is substantive and the choice of law analysis must proceed to the next step.

■ The choice of law is determined by the analysis of five factors: (1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's governmental interest; and (5) application of the better rule of law. *Northwest Airlines*, 111 F.3d at 1393, quoting *Jepson v. General Casualty Co. of Wisconsin*, 513 N.W.2d 467, 470 (Minn.1994).

■ The first factor, predictability of results, is most relevant when parties have expectations about the applicable law. *Northwest Airlines*, 111 F.3d at 1394, quoting *Milkovich v. Saari*, 295 Minn. 155, 203 N.W.2d 408, 412 (1973). Although the Court cannot know the parties' subjective expectations, the fact that the Plaintiff is a Wisconsin resident who was working for her employer in Wisconsin suggests that the application of Wisconsin employment statutes would have been the more reasonable expectation of the parties.

■ In examining the second factor, maintenance of interstate order, the court looks at the contacts the state has with the issues being litigated. *Northwest Airlines*, 111 F.3d at 1394, citing *Myers v. Government Employees Ins. Co.*, 302 Minn. 359, 225 N.W.2d 238, 242 (1974). Again, the Plaintiff is a Wisconsin resident who is suing her employer for injuries she allegedly suffered in Wisconsin. Minnesota's contacts are limited to the fact that HTI is a Minnesota corporation and that the picture of the Plaintiff was apparently found on a disk in a computer that originated from HTI's Minnesota facility. Nevertheless, the injuries of which the Plaintiff complains all allegedly occurred in Wiscon-

sin, and Wisconsin has the more significant contacts with the claims at issue.

The third factor, simplification of the judicial task, is not a significant factor in this case because the law of either state could be applied without difficulty. *Jepson*, 513 N.W.2d at 472. The fourth factor, advancement of the forum's governmental interest, favors Wisconsin, as Wisconsin has an interest in having its principles of employment law applied when a Wisconsin resident sues her employer for injuries she allegedly incurred in Wisconsin.

■ A court need not reach the final factor, the better rule of law, where the preceding four factors clearly dictate the application of one state's law. *Klimstra v. State Farm Auto Ins. Co.*, 891 F.Supp. 1329, 1336 (D.Minn.1995), *aff'd*, 95 F.3d 686, citing *Myers*, 225 N.W.2d at 241. Therefore, as analysis of the first four factors favors the application of Wisconsin law, Wisconsin law governs the present matter.

## 2. The Wisconsin Workers Compensation Act

■ The WCA affords the "exclusive remedy" for workplace injuries. Wis. Stat. § 102.03(2). *Stefanski v. R.A. Zehetner & Assoc., Inc.*, 855 F.Supp. 1030, 1033 (E.D.Wis.1994). The WCA thus precludes an employee from bringing a tort action against his or her employer for a work-connected injury. *Messner v. Briggs & Stratton Corp.*, 120 Wis.2d 127, 353 N.W.2d 363, 364 (1984). Where the underlying injury is work connected, an employer is immune to otherwise recognized common lawsuits. *Messner*, 353 N.W.2d at 368. In the present matter, the Plaintiff has set forth claims of defamation, intentional infliction of emotional distress, negligent infliction of emotional distress, and negligent supervision against HTI arising

out of the injuries she allegedly suffered in connection with the pornographic picture.

Wisconsin courts have consistently held that intentional acts fall within the purview of the WCA. *Jenson v. Employers Mutual Casualty Co.*, 161 Wis.2d 253, 468 N.W.2d 1, 6 (1991). Specifically, the Wisconsin Court of Appeals held that a claim of defamation arising out of sexual comments made to other employees regarding the plaintiff was barred by the exclusivity provisions of the WCA. *Becker v. Automatic Garage Door Co.*, 156 Wis.2d 409, 456 N.W.2d 888, 891–92 (1990). Similarly, a claim for intentional infliction of emotional distress stemming from incidents of sexual harassment was held to be barred by the exclusivity clause of the WCA. *Hibben v. Nardone*, 137 F.3d 480, 484 (7th Cir.1998).

Similarly-based negligence claims are also precluded. A claim of negligent infliction of emotional distress arising out of sexual harassment in the workplace was held to be barred by the exclusive remedy provision of the WCA. *Busse v. Gelco Express Corp.*, 678 F.Supp. 1398, 1400 (E.D.Wis.1988). Finally, a claim of negligent retention "falls squarely within the reach of § 102.03(2)" and thus is barred. *Johnson v. Hondo, Inc.*, 125 F.3d 408, 418 (7th Cir.1997).

As Wisconsin law applies to the present matter, and as each of the Plaintiff's tort claims is precluded by the Wisconsin Workers Compensation Act, the claims must be dismissed as a matter of law.

### E. Count Five: Breach of Contract

■ The Plaintiff alleges that HTI's agreement to make a plant-wide announcement that she was not the woman depicted in the picture created an enforceable contract, which HTI breached when management decided that a plant-wide announcement would create and perpetuate more problems than it would solve. For purposes of the present summary judgment motion, the Plaintiff's testimony that Mr. Fry made the statements alleged will be accepted as true.

■ An employer's particular promise may create a binding unilateral contract, if in the form of an offer and if accepted by the employee for valuable consideration. *Ruud v. Great Plains Supply, Inc.* 526 N.W.2d 369, 371 (Minn.1995). The offer is required to be definite in form and communicated to the offeree. *Ruud*, 526 N.W.2d at 371. The issue is one of determining whether there was an "intention to make such a promise as an offer and to be bound by it." *Ruud*, 526 N.W.2d at 372, quoting *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 533, 117 N.W.2d 213, 221 (1962). In the present matter, although Mr. Fry's purported statement may have been definite in form, the intent to be bound by the statement was not. The Court finds that the statement in question did not evince the necessary intention to make any such promise as an offer or to be bound by it.

■ The breach of contract claim also fails for lack of consideration. An exchange of promises may constitute consideration. *Pincus v. Pabst Brewing Co.*, 893 F.2d 1544, 1549 (7th Cir.1990). In the present matter, however, the record contains no evidence of any corresponding promise on the Plaintiff's part. The Plaintiff merely continued her employment at HTI under the same terms as before. However, under Wisconsin law, past consideration alone cannot constitute consideration. *Pincus*, 893 F.2d at 1549. Therefore, the purported contract fails for lack of consideration.

Because the record does not establish that HTI intended to be bound by the alleged agreement to make an announcement regarding the Plaintiff, and because the Plaintiff made no mutual promise so as to constitute adequate consideration, the

breach of contract claim must be dismissed as a matter of law.

## Conclusion

Although the Plaintiff was clearly and understandably upset regarding the circulation of the picture among the employees and the continuing gossip and rumors that were engendered, HTI is not liable for sexual harassment. HTI took prompt and appropriate remedial measures to eliminate the presence of the picture in the workplace. The ensuing gossip and rumors in the workplace and the community did not constitute actionable sexual harassment under Title VII.

The Plaintiff's common law claims must be dismissed as well. The tort claims are precluded by the Wisconsin Workers Compensation Act, and the alleged promises to make an announcement that the picture was not of the Plaintiff did not create an enforceable contract.

For the reasons stated, **IT IS HEREBY ORDERED:**

1. The Motion by the Defendant for Summary Judgment (Doc. No. 50) is **GRANTED.**

2. The Plaintiff's Complaint is **DISMISSED WITH PREJUDICE.**

LET JUDGMENT BE ENTERED ACCORDINGLY.